### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
#### www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| BankUnited Financial Corporation, *et al.*,[1] | Case No. 09-19940-LMI |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF BANKUNITED FINANCIAL CORPORATION, *et al.*, | Adversary Proceeding No. _____ |
| Plaintiff, | |
| v. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | |
| Defendant. | |

**COMPLAINT PURSUANT TO 28 U.S.C. § 2201(a), 11 U.S.C. § 541 AND RULE 7001(2) AND (9) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE SEEKING A DECLARATORY JUDGMENT DETERMINING THE VALIDITY, PRIORITY AND EXTENT OF INTERESTS IN CLAIMS ASSERTED AGAINST CERTAIN FORMER OFFICERS OF DEBTOR BANKUNITED FINANCIAL CORPORATION**

The Official Committee of Unsecured Creditors of the above-captioned Debtors (the "Committee" or "Plaintiff") files against the Defendant, the Federal Deposit Insurance Corporation, as receiver for BankUnited, FSB (the "FDIC"), this Complaint Pursuant to 28 U.S.C. § 2201(a), 11 U.S.C. § 541 and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy

---

[1] The debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  BankUnited Financial Corporation, a Florida corporation (7773); CRE America Corporation, a Florida corporation (0049); and BankUnited Financial Services, Incorporated, a Florida corporation (8335) (collectively, the "Debtors").

Procedure Seeking a Declaratory Judgment Determining the Validity, Priority and Extent of Interests in Claims Asserted Against Certain Former Officers of Debtor BankUnited Financial Corporation, and states the following:

## PRELIMINARY STATEMENT

This adversary proceeding seeks a declaratory judgment determining that the claims set forth in the form of complaint attached hereto as Exhibit "A" (the "Proposed Complaint") constitute property of the estate (the "Estate") of Debtor BankUnited Financial Corporation ("BUFC") under Section 541 of title 11 of the United States Code and that the Committee, therefore, has standing to bring such claims on behalf of the Estate.

The claims set forth in the Proposed Complaint assert that BUFC's former Chief Executive Officer, Alfred R. Camner ("Camner"), and former Chief Financial Officer, Humberto L. Lopez ("Lopez," and, together with Camner, the "Proposed Defendants"), breached their fiduciary duties to BUFC as officers of BUFC. The Proposed Complaint avers that such breaches caused injury to BUFC for which the Proposed Defendants are liable to BUFC and seeks the recovery of monetary damages from the Proposed Defendants.

In numerous pleadings filed in the above-captioned Chapter 11 case, the FDIC has asserted that claims of the type set forth in the Proposed Complaint belong to the FDIC, as receiver for BankUnited, FSB (the "Bank"), and that the Committee has no standing to bring the claims against the Proposed Defendants on behalf of the Estate. The Committee vigorously disputes the FDIC's contentions, but, before filing the Proposed Complaint, desires to obtain clarity with respect to the claims ownership issue in order to make responsible decisions about its future course of conduct. Accordingly, the Committee has filed this declaratory judgment action

seeking a determination of who owns the claims asserted in the Proposed Complaint – the Estate or the FDIC.[2]

The Committee respectfully submits that the Court should find and declare that the claims set forth in the Proposed Complaint constitute property of the Estate and that the Committee has standing to bring them against the Proposed Defendants.

<u>**JURISDICTION AND VENUE**</u>

1.     This adversary proceeding arises under title 11 of the United States Code (the "Bankruptcy Code") and arises in a case under the Bankruptcy Code.  It involves an actual controversy which is ripe for determination and is justiciable  under 28 U.S.C. § 2201(a) and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure.

2.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

3.     This adversary proceeding relates to <u>In re BankUnited Financial Corporation</u>, Chapter 11 Case No. 09-19940-LMI, pending in the United States Bankruptcy Court for the Southern District of Florida, Miami Division.  It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

---

[2] In addition to its power under 28 U.S.C. § 2201(a) to render a declaratory judgment, the Court has the power to grant the relief requested by determining the validity, priority and extent of  interests in the property that is the subject of the dispute between the Committee and the FDIC, namely, the claims set forth in the Proposed Complaint. Fed. R. Bankr. P. 7001(2), (9).

## BACKGROUND

5.      On May 22, 2009 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors currently are functioning as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Debtor BUFC was the direct parent of the Bank, a federally chartered savings institution.

7.      On May 21, 2009, the Office of Thrift Supervision closed the Bank and appointed the FDIC as receiver, thereby necessitating the filing of the Debtors' bankruptcy cases.  The FDIC has transferred the Bank's assets and most liabilities to a newly chartered federal savings bank.

8.      The Debtors' primary assets now consist of cash, tax attributes and litigation claims.

9.      On May 29, 2009, the acting United States Trustee for Region 21 appointed the Committee and filed an appropriate notice of appointment.  [Docket No. 33].

10.      BUFC's assets include the following directors and officers liability insurance policies: (i) St. Paul Mercury Insurance Directors and Officers and Company Liability Policy, policy no.  EC06800963, and RSUI Indemnity Company Excess Directors and Officers Liability Policy, policy no.  NHS627127, which provide a total of $20 million in coverage for acts occurring prior to November 10, 2008, and, under which, claims sufficient to trigger coverage must have been asserted prior to the expiration of the extended reporting period, which may have been as early as November 10, 2009 (collectively, the "Pre-November 2008 D&O Policy"); and (ii) United States Fire Insurance Company Directors and Officers Liability Policy, policy no. 14MGU08A17883, and Underwriters at Lloyd's London Excess Director and Officers Liability

Policy, policy no. AP1084377, which provide a total of $30 million in coverage for acts occurring on or after November 10, 2008, and, under which, claims sufficient to trigger coverage must have been asserted prior to the expiration of the extended reporting period, which may have been as early as November 10, 2009 (the "Post-November 2008 D&O Policy", and, together with the Pre-November 2008 D&O Policy, the "D&O Policies").

11.     Based on BUFC's financial collapse and information obtained by the Committee's professionals, the Committee suspected that claims on behalf of the Estate existed against, among others, certain of BUFC's former officers and current and former directors (collectively, the "Insiders"), including without limitation claims arising from breaches of fiduciary duties owed by the Insiders to BUFC.

12.     Because the Insiders could not be expected to cause the Debtors to investigate or pursue such claims against the Insiders, on August 31, 2009, the Committee filed the Motion of the Official Committee of Unsecured Creditors for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers, Directors and Prepetition Professionals [Docket No. 228] (the "Derivative Standing Motion").  After a hearing thereon, the Court, on September 30, 2009, entered an Order granting the Derivative Standing Motion [Docket No. 279] (the "Derivative Standing Order"), pursuant to which the Committee was granted standing to investigate, assert and prosecute any and all claims that are property of the Debtors' bankruptcy estates against the Insiders.

13.     On October 9, 2009, the Committee filed and served Notices of Rule 2004 Examinations on, among others, several Insiders, including the Proposed Defendants (collectively, the "2004 Notices").  Pursuant to the 2004 Notices, the Committee requested the

production of various documents relevant to its investigation and conducted the examinations of the Proposed Defendants, among others.

14.    On November 5, 2009, Committee counsel dispatched demand letters (the "Demand Letters") to certain Insiders, including the Proposed Defendants, asserting claims against them on behalf of the Estate for acts or omissions in their capacities as executive officers of BUFC or in their capacities as directors of BUFC.  The Demand Letters were received by the respective Insiders on or about November 6, 2009, and notice to the appropriate carriers of the claims made in the Demand Letters triggered coverage under the D&O Policies.

15.    Since the filing of the Derivative Standing Motion, the FDIC consistently has sought to impede the investigation, assertion and prosecution by the Committee of claims against the Insiders on behalf of the Estate, by contending that such claims necessarily would be derivative of the Bank and belong to the FDIC, as receiver for the Bank, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989.[3]  Relying on its flawed interpretation of  In re Southeast Banking Corporation, 827 F. Supp. 742 (S.D. Fla. 1993), on November 24, 2009, the FDIC filed the Motion to Enforce, in which it argued that the claims asserted in the Demand Letters are outside the permissible "sliver" of claims the Committee may legally assert because such claims are within the exclusive purview of the FDIC.  Motion to Enforce, ¶ 26 at p. 11.  In addition, the FDIC contended that because the FDIC owned the claims

_____

[3] The FDIC has filed numerous pleadings advocating this position, none of which have been found persuasive by the Court.  See Objection of the Federal Deposit Insurance Corporation to Motion of the Official Committee of Unsecured Creditors for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers, Directors and Prepetition Professionals [Docket No. 252]; Reservation of Rights of the Federal Deposit Insurance Corporation to First Interim Application for Compensation and Payment of Itemized Charges and Expenses to Kilpatrick Stockton LLP as Counsel for the Official Committee of Unsecured Creditors for the Period From June 5, 2009, Through and Including  September 30, 2009 [Docket No. 360]; Motion of the Federal Deposit Insurance Corporation to Enforce the Order Granting, as Modified, Committee's Motion for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers, Directors and Prepetition Professionals [Docket No. 373] (the "Motion to Enforce"); Objection of the Federal Deposit Insurance Corporation to Second Interim Application for Compensation and Payment of Itemized Charges and Expenses to Kilpatrick Stockton LLP as Counsel for the Official Committee of Unsecured Creditors for the Period From October 1, 2009, Through and Including  January 31, 2010 [Docket No. 518].

asserted in the Demand Letters, the Committee violated the Derivative Standing Order and should be prohibited from investigating, asserting or prosecuting those claims. Id.

16.     As stated in the Committee's response to the Motion to Enforce [Docket No. 409], the Motion to Enforce was not a proper vehicle for determining the claims ownership issue because the Committee did not violate the terms of the Derivative Standing Order even if claims made in the Demand Letters ultimately were determined to belong to the FDIC.

17.     On December 28, 2009, the Court held a hearing on the Motion to Enforce and agreed with the Committee's position. For ease of reference, a true and correct copy of the transcript of the December 28, 2009 hearing is attached hereto as Exhibit "B". The Court entered an Order on January 6, 2010 [Docket No. 426] denying the Motion to Enforce for the reasons stated at the December 28, 2009 hearing.[4]

18.     It is clear that an actual controversy exists between the Committee and the FDIC regarding the ownership of the claims set forth in the Proposed Complaint. Moreover, now that the claims have been embodied in a formal complaint, the controversy is ripe for adjudication.

19.     Granting the relief requested in this Complaint will provide clarity regarding the ownership of the claims set forth in the Proposed Complaint and enable the Committee to make prudent decisions about whether, as the Committee currently believes to be the case, all of the claims currently set forth in the Proposed Complaint should be included when it is filed against the Proposed Defendants.

20.     In addition, because the determination this Court is being requested to make will constitute a determination of the validity, priority and extent of BUFC's interest in the claims in question, a determination particularly within the province of the bankruptcy court, a declaratory judgment deciding the ownership issue at this time is clearly appropriate.

---

[4] On January 19, 2010, the FDIC filed a Notice of Appeal with regard to this Order [Docket No. 437].

## COUNT I

## DECLARATORY JUDGMENT DETERMINING THAT THE CLAIMS SET FORTH IN THE PROPOSED COMPLAINT CONSTITUTE PROPERTY OF THE ESTATE PURSUANT TO SECTION 541 OF THE BANKRUPTCY CODE

21.     The Plaintiff repeats and realleges the averments in paragraphs 1 through 20 of this Complaint as if restated in this paragraph in their entirety.

22.     The commencement of BUFC's Chapter 11 case created the Estate.

23.     Under Section 541(a) of the Bankruptcy Code, except as provided in subsections (b) and (c)(2) of Section 541, the Estate is comprised of all legal and equitable interests of BUFC in property as of the Petition Date.

24.     As of the Petition Date, BUFC held all legal and equitable interests in the claims set forth in the Proposed Complaint because the claims are direct claims against the Proposed Defendants for breach of their fiduciary duties to BUFC in their capacity as officers of BUFC, resulting in damage to BUFC.  See General Rubber Co. v. Benedict, 215 N.Y. 18, 109 N.E. 96 (1915); Ochs v. Simon (In re First Central Financial Corp.), 269 B.R. 502 (Bankr. E.D.N.Y. 2001).

25.     None of the exceptions to Section 541(a) of the Bankruptcy Code are applicable to the claims set forth in the Proposed Complaint.

26.     Accordingly, all of the claims set forth in the Proposed Complaint are property of the Estate, and not property of the FDIC as receiver for the Bank.

27.     Under the terms of the Derivative Standing Order, the Committee, on behalf of the Estate, is authorized to prosecute the claims set forth in the Proposed Complaint against the Proposed Defendants.

WHEREFORE, the Plaintiff respectfully requests that (1) a declaratory judgment be entered in favor of the Plaintiff under Count I of this Complaint, determining that the claims set forth in the Proposed Complaint constitute property of the Estate which the Plaintiff is authorized to prosecute, on behalf of the Estate, and (2) the Court grant the Plaintiff such other and further relief as is just and proper under the circumstances.

Dated:  May 25, 2010

KILPATRICK STOCKTON LLP

  /s/ Todd C. Meyers
Todd C. Meyers
Georgia Bar No. 503756
Sameer K. Kapoor
Georgia Bar No. 407525
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)
tmeyers@kilpatrickstockton.com
skapoor@kilpatrickstockton.com

and

KOZYAK TROPIN & THROCKMORTON, P.A.

Corali  Lopez-Castro, Esq.
Florida Bar No. 863830
2525 Ponce De Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800 (Telephone)
(305) 372-3508 (Facsimile)
clc@kttlaw.com

Counsel for the Official Committee of Unsecured Creditors of BankUnited Financial Corporation, *et al.*

# **EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| BankUnited Financial Corporation, | ) | |
| CRE America Corporation and | ) | |
| BankUnited Financial Services, | ) | |
| Incorporated, | ) | |
| | ) | Case No. 09-19940-LMI |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Official Committee of | ) | Adversary No. 10-_____ |
| Unsecured Creditors of BankUnited | ) | |
| Financial Corporation, CRE America | ) | |
| Corporation and BankUnited Financial | ) | |
| Services, Incorporated, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Alfred R. Camner and | ) | |
| Humberto L. Lopez, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT FOR RECOVERY OF DAMAGES**

This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the duly appointed Official

Committee of Unsecured Creditors of the above-captioned Debtors (the "Committee"), on

behalf of their respective bankruptcy estates, to recover damages against, individually, Alfred

---

[1] The Debtors' cases are being jointly administered.

- 1 -

R. Camner ("Camner") and Humberto L. Lopez ("Lopez") (collectively "Defendants").
Plaintiff shows as follows:

## PRELIMINARY STATEMENT

1.          Debtor BankUnited Financial Corporation (the "Holding Company") is incorporated in the State of Florida and headquartered in Coral Gables, Florida.  The Holding Company is the former holding company of BankUnited, FSB (the "Bank"), a federally chartered savings bank.  The Bank was wholly-owned by, and was the primary asset of, the Holding Company.  The Holding Company and its subsidiaries, including the Bank, are referred to collectively herein as the "Company."

2.          Defendants are former senior officers of the Holding Company who held their respective offices during the operative events.  Each Defendant while an executive officer acted as an agent of the Holding Company and owed fiduciary duties to the Holding Company to discharge his officer duties in good faith, with the care an ordinarily prudent person in a like position (having the special skills and knowledge reasonably expected of a person in his position) would exercise under similar circumstances, and in the Holding Company's best interests.  Among the duties of Defendants in their respective capacities as CEO and CFO of the Holding Company were to take such actions as necessary to cause effective internal controls over financial accounting and over risk management to be implemented by the Company, and to cause financial information presented to the Holding Company's Board to be accurate.  In performing their duties as officers and therefore agents of the Holding Company, Defendants were not shielded by the business judgment rule.

3.          The Holding Company was a publicly traded corporation that filed regular reports with the United States Securities and Exchange Commission ("SEC").  These reports

- 2 -

included financial information upon which the Holding Company's board of directors (the "Holding Company's Board") and the investing public relied.

4.      The Holding Company raised capital during the Relevant Period (as defined below), a substantial portion of which it contributed to the Bank to support the Bank's lending activities.

5.      As explained in the following paragraphs, from January 1, 2007 through May, 2009 (the "Relevant Period"), one or more of Defendants presented incomplete and inaccurate information to the Holding Company's Board and to the investing public about (a) the financial condition of the Holding Company and the Bank, and (b) the Bank's risk management policies and overall risk to the Holding Company presented by the nontraditional residential loan portfolio of the Bank.  The nontraditional residential loan portfolio consisted primarily of Option Adjustable Rate Mortgages known as "Option ARMs."

6.      The incomplete and inaccurate information presented by Defendants to the Holding Company's Board during the Relevant Period prevented the Board from accurately assessing the risk posed to the Holding Company by the Option ARM portfolio, from taking action to control the growth of the Option ARM portfolio, and from making informed decisions about whether the Holding Company should invest capital in the repurchase of its stock in the market place and pay dividends to the Holding Company's shareholders.

7.      Defendants breached their fiduciary duties of care and loyalty to the Holding Company by not discharging their respective responsibilities as officers of the Holding Company: (1) to devote sustained, affirmative attention to seeing to it that effective internal controls were established and maintained over the Holding Company's financial

- 3 -

accounting and reporting; (2) to see to it that effective systems and procedures were implemented and sufficient and qualified personnel were employed to enable the Holding Company to account for and accurately report the Holding Company's consolidated financial results; (3) to see to it that effective internal risk assessment and management functions were implemented to enable the Holding Company's Board to assess and manage the risks in the Bank's loan portfolio; (4) to provide accurate and complete disclosures to the Holding Company's Board regarding (a) the financial condition of the Holding Company; (b) the effectiveness of the Holding Company's internal controls over financial accounting and reporting, and (c) the effectiveness of the systems, procedures, and personnel in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis; (5) to avoid material misrepresentations and omissions in consolidated financial statements presented to the Holding Company's Board and filed with federal regulators; and (6) to protect the Holding Company against the diminution in value of its interest in the Bank by seeing to it that the Bank was managed properly.

8.      By breaching their fiduciary duties to the Holding Company in their respective capacities as officers of the Holding Company, Defendants injured the Holding Company by (a) causing the Holding Company improvidently to expend valuable capital to repurchase shares of the Holding Company's stock and pay dividends on the Holding Company's stock; (b) causing the Holding Company's Board to approve the infusion of $80 million of the Holding Company's funds into the Bank at a time when the Bank had no realistic prospect for survival; (c) deepening the Holding Company's eventual insolvency through the improvident incurrence of additional debt at a time when the Holding

- 4 -

Company's insolvency was unavoidable, which artificially prolonged the Holding Company's existence and caused it to incur additional losses; (d) failing to protect the Holding Company's assets by causing or acquiescing in the unsafe and unsound lending practices of the Bank, which caused the Bank to be closed by the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC") to be appointed receiver for the Bank on May 21, 2009, rendering valueless the Holding Company's interest in the Bank and precipitating the Holding Company's bankruptcy; and (e) failing to cause the Holding Company to exercise its authority as the controlling shareholder of the Bank, to correct the Bank's unsafe and unsound practices.

## **PARTIES**

9.        Plaintiff is the Official Committee of Unsecured Creditors of BankUnited Financial Corporation, CRE America Corporation and BankUnited Financial Services, Incorporated and, by order dated September 29, 2009 has been granted standing to investigate, assert and pursue the claims asserted in this Complaint.  [Docket No. 279.]

10.        On information and belief, Defendant Camner is a resident of Miami-Dade County, Florida.  Camner was the chief executive officer ("CEO") of the Holding Company and the Chairman of the Holding Company's Board from 1993 until about October 20, 2008.

11.        On information and belief, Defendant Lopez is a resident of Miami-Dade County, Florida.  Lopez is a Certified Public Accountant ("CPA") who served as the Holding Company's Chief Financial Officer ("CFO") from 2001 to about May 22, 2009.

12.        The debtors are BankUnited Financial Corporation, a Florida corporation, CRE America Corporation, a Florida corporation, and BankUnited Financial Services, Incorporated, a Florida corporation (collectively, the "Debtors").

- 5 -

## JURISDICTION AND VENUE

13.     The Committee brings this adversary proceeding pursuant to Bankruptcy Rule 7001(1).

14.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

15.     The adversary proceeding relates to In re BankUnited Financial Corporation, Chapter 11 Case No. 09-19940-LMI, pending in the United States Bankruptcy Court for the Southern District of Florida, Miami Division.  It is a non-core proceeding. Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Judge.

16.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### I.     Procedural History

17.     On May 22, 2009 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in this court (the "Bankruptcy Court" or the "Court").  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.     On May 21, 2009, the OTS closed the Bank and appointed the FDIC as receiver.  The FDIC subsequently transferred the Bank's assets and most of its liabilities to a newly chartered federal savings bank (the "New Bank") organized under the laws of the United States and having its principal place of business in Coral Gables, Florida.

- 6 -

US2008 1144828.19

19.     The Debtors' primary assets consist of cash, tax attributes, and litigation claims.

20.     On May 29, 2009, the acting United States Trustee for Region 21 appointed the Committee and filed an appropriate notice of appointment.  [Docket No. 33].

21.     On August 31, 2009, the Committee filed the Motion of the Official Committee of Unsecured Creditors for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers, Directors and Prepetition Professionals in the Bankruptcy Proceeding [Docket No. 228] (the "Derivative Standing Motion").  This motion was granted, as orally modified, by an Order issued on September 29, 2009 [Docket No. 279], conferring on Plaintiff standing to file and prosecute this Complaint.


## II.     Defendants Direct and Oversee the Rapid Growth of Assets via the Origination of Risky Option ARM Residential Mortgages

22.     The Bank was a federally chartered savings bank located in Coral Gables, Florida and was the largest independent bank headquartered in the state of Florida.

23.     The Company operated under a fiscal year ("Fiscal Year") running from October 1 through September 30.  In this Complaint, a fiscal year of the Company will be identified by the calendar year in which the fiscal year ends.  Thus, for example, the period from October 1, 2006 through September 30, 2007 will be referred to as the Company's 2007 Fiscal Year.  The first quarter of the Company's Fiscal Year ran from October 1 to December 31 ("1Q"), the second fiscal quarter ran from January 1 to March 31 ("2Q"), the third fiscal quarter ran from April 1 to June 30 ("3Q"), and the fourth fiscal quarter ran from July 1 to September 30 ("4Q").

24.     The Bank conducted traditional banking activities, including residential real estate lending, which was the largest portion of the Bank's loan portfolio.  In the case of residential real estate lending, as described in more detail below, the Bank focused on offering nontraditional mortgage products to its customers.

25.     Around 2003, Defendants implemented a new business strategy under which the Bank rapidly expanded the number and amount of the residential mortgage loans it originated.  This growth continued through the fourth quarter of Fiscal Year 2007.  Defendants certified SEC reports stating that the value of the Bank's one-to-four family residential mortgage loan portfolio grew from approximately $3.3 billion as of September 30, 2003, to approximately $4.7 billion as of September 30, 2004, to $6.7 billion as of September 30, 2005, to $9.7 billion as of September 30, 2006, and to $10.8 billion as of September 30, 2007.

26.     This growth in purported loan value was attributable principally to a large expansion of the Bank's Option ARM loan portfolio, a strategy promoted by Defendant Camner, who effectively controlled the Holding Company through his stock ownership and his roles as the Holding Company's CEO and Board Chairman.

27.     An Option ARM is an adjustable rate mortgage loan which permits the borrower to select from a menu of monthly payment options.  Option ARMs provide a borrower with flexibility to select the amount of the monthly payment from among several options without triggering a default of the mortgage.  Under an Option ARM, the borrower may elect initially to make lower monthly loan payments and limit the amount of annual increases in the required monthly payment.

- 8 -

28.    The payment options available to Option ARM borrowers have consequences for these borrowers.  The loan will negatively amortize when the borrower elects a payment option that does not cover fully the interest accruing on the loan.  In a negatively amortizing loan, unpaid accrued interest is added to the principal balance of the loan, upon which interest is calculated.  One consequence of a negatively amortizing loan is that the borrower's obligation on the loan increases monthly rather than decreasing or remaining constant following the monthly payment.  At an event specified in the loan documents, the minimum monthly payment is "recast" to require payments that will fully amortize the outstanding loan balance over the remaining loan term.  This recasting causes required monthly payments to increase, often dramatically, resulting in what the banking industry refers to as "payment shock."

29.    Option ARMs increased as a percentage of the Bank's one-to-four family residential mortgage loan portfolio from 33.2 percent in September 2004 to 69.5 percent in September 2007.

30.    The Bank originated many Option ARM loans based on little or no documentation from borrowers of the type required to qualify for traditional loan products.  Many borrowers obtained Option ARMs without providing documents to the Bank verifying either their assets, income, or employment status, or a combination of these criteria.

31.    As of March 31, 2008, only 17.4 percent of all loans (including Option ARMs) in the Bank's one-to-four family residential mortgage loan portfolio consisted of "full documentation employment verified" ("Full Documentation") loans.  Approximately 73.6 percent of this loan portfolio consisted of "stated income verified assets and employment" or "reduced documentation employment verified" (collectively, "Limited

- 9 -

Documentation") loans, and 9 percent consisted of no documentation ("No Documentation") loans.  With respect to the Option ARM loans in the portfolio, only 12.4 percent were Full Documentation loans, while 56.3 percent were Limited Documentation loans, and the remaining 31.3 percent were No Documentation loans.

### III.    Bank Regulators Express Concern and Propose Interagency Guidance Regarding "Nontraditional" Mortgages in December 2005

32.     In December 2005, federal bank regulators ("Bank Regulators") expressed concerns about nontraditional loan products, including Option ARMs.  Bank Regulators were particularly concerned about Option ARMs based on reduced documentation, such as the No Documentation and Limited Documentation loans made by the Bank.

33.     On December 29, 2005, Bank Regulators published Proposed Guidance on Nontraditional Mortgage Product Risk ("Proposed Guidance") and solicited public comments.  The Proposed Guidance was published in the Federal Register at 70 Fed. Reg. 77,249.  The term "nontraditional mortgage products" was defined to include interest-only mortgages and Option ARMs.

34.     The Proposed Guidance characterized Option ARMs and interest-only mortgages as "nontraditional mortgage loans."  It stated that, in order to manage the risks associated with nontraditional mortgage loans, management of financial institutions should "[r]ecognize that many nontraditional mortgage loans, particularly when combined with risk-layering features, are untested in a stressed environment, and, therefore, warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio."  Proposed Guidance, 70 Fed. Reg. at 77,252.  The Proposed Guidance noted such "risk-layering" practices as loans

- 10 -

underwritten with "less stringent or no income and asset verification requirements ('reduced documentation')." Id.

35.     The Proposed Guidance further stated that (a) financial "institutions should recognize that the limited performance history of [nontraditional mortgage] products, particularly in a stressed environment, increases performance uncertainty"; (b) "institutions should ensure that portfolio and risk management practices keep pace with the growth and changing risk profile of their nontraditional mortgage loan portfolios"; (c) "active portfolio management is especially important for institutions that project or have already experienced significant growth or concentrations of nontraditional mortgages"; and (d) institutions "should adopt more robust risk management practices and manage these exposures in a thoughtful, systematic manner by," among other things, "[e]stablishing appropriate [Allowance for Loan and Lease Losses ("ALLL")] levels that consider the credit quality of the portfolio and conditions that affect collectibility" and "[m]aintaining capital at levels that reflect portfolio characteristics and the effect of stressed economic conditions on collectibility." Proposed Guidance, 70 Fed. Reg. at 77,250, 77,253.

36.     In terms of specific risk management practices, the Proposed Guidance advised financial institutions to (a) "[d]evelop[] written policies that specify acceptable product attributes, production and portfolio limits, sales and securitization practices, and risk management expectations"; (b) "[e]stablish[] appropriate ALLL levels that consider the credit quality of the portfolio and conditions that affect collectibility"; and (c) "[m]aintain[] capital at levels that reflect portfolio characteristics and the effect of stressed economic conditions on collectibility." Proposed Guidance, 70 Fed. Reg. at 77,253.

- 11 -

37.        Notwithstanding the concerns expressed by Bank Regulators in the Proposed Guidance, the Bank, under the auspices of the Camner-controlled Holding Company, continued to promote the origination of Option ARM loans throughout 2006 and part of 2007, often on a reduced documentation or no documentation, stated income basis, and the Option ARM portfolio continued to grow.

A.    **Proposed Guidance:**  Allowance for Loan and Lease Losses – "**ALLL**"

38.        The Proposed Guidance emphasized that banks holding nontraditional loan product portfolios needed to determine an adequate ALLL to manage the risks created by the nontraditional loan products.

39.        The ALLL is an accounting book entry that functions as a valuation reserve banks establish to recognize estimated loan impairment before probable losses on individual loans are confirmed.  The ALLL is an estimate of probable, but unconfirmed, uncollectible amounts in the loan portfolio as of the financial statement date, and is used to reduce the book value of loans and leases to the amount expected to be collected.

40.        The Proposed Guidance counseled financial institutions to segment their nontraditional mortgage loan portfolios into pools of loans with similar risk characteristics in order to calculate the institution's ALLL.  Specifically, the Proposed Guidance stated that,

> In establishing an appropriate ALLL and considering the adequacy of capital, institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics. The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Credit risk segments should also distinguish among loans with differing payment and portfolio characteristics, such as borrowers who habitually make only minimum payments, mortgages with existing balances above original balances due to negative amortization, and mortgages subject to sizable payment shock. The objective is to identify key credit quality indicators that affect collectibility for

- 12 -

> ALLL measurement purposes and important risk characteristics that influence expected performance so that migration into or out of key segments provides meaningful information about future loss exposure for purposes of determining the level of capital to be maintained.

Proposed Guidance, 70 Fed. Reg. at 77,255.

### B.      Proposed Guidance:  Stress Testing

41.      The Proposed Guidance also advised banks to conduct "stress tests" of their Option ARM and other nontraditional loan portfolios to better assess and manage the risks these loans presented when compared to the risks posed by traditional residential mortgage loans.  These stress tests were expected to enhance predictability about how nontraditional loan portfolios would perform during stressed economic conditions and to provide banks information critical to managing and mitigating those risks in advance of the occurrence of stressed economic conditions.

42.      The Proposed Guidance counseled institutions to perform

> stress tests on key performance drivers such as interest rates, employment levels, economic growth, housing value fluctuations, and other factors beyond the institution's immediate control. Stress tests typically assume rapid deterioration in one or more factors and attempt to estimate the potential influence on default rates and loss severity. Through stress testing, an institution should be able to identify, monitor and manage risk, as well as develop appropriate and cost-effective loss mitigation strategies. The stress testing results should provide direct feedback in determining underwriting standards, product terms, portfolio concentration limits, and capital levels.

Proposed Guidance, 70 Fed. Reg. at 77,255.

- 13 -

**C.    In Response to the Proposed Guidance, Defendants Failed to Take Steps to Ensure that the Holding Company's Risk Management Procedures Incorporated Stress Testing and that its Internal Controls over Financial Accounting Were Modified to Include a Reliable ALLL Calculation Model**

43.    Even though the performance of the Bank's Option ARM portfolio remained untested under stressed economic conditions, and despite the concerns Bank Regulators expressed in the Proposed Guidance regarding the performance uncertainty presented by nontraditional mortgage products such as Option ARMs because such loans were untested under stressed economic conditions, Defendants, as the most senior officers of the Holding Company (the Bank's controlling shareholder), made no efforts in 2006 to cause the Bank to implement stress testing of the Bank's Option ARM portfolio as set forth in the Proposed Guidance.

44.    In addition, Defendants in 2006 did not take action to ensure that the Holding Company's internal controls over financial accounting incorporated the modifications to the ALLL calculation methodology described in the Proposed Guidance.

45.    Rather, under the leadership of Defendants, the Holding Company permitted the Bank in 2006 to continue increasing its originations of Option ARM loans without subjecting the Option ARM loan portfolio to stress testing, and the Option ARMs continued to increase as a percentage of the Bank's overall residential mortgage portfolio.

46.    Despite warnings in the Proposed Guidance regarding the importance of sound underwriting standards for nontraditional mortgage products, in 2006, the risk in the Bank's Option ARM portfolio increased because, among other reasons, borrowers with lower credit scores were given loans and other qualifying criteria for some of the Bank's nontraditional mortgage loan programs were eased.

**IV.**   **The Final Guidance Reiterates Concerns Regarding Nontraditional Mortgage Products**

47.        On September 25, 2006, Bank Regulators issued final guidance ("Final Guidance") to address the risks posed by nontraditional mortgage products.   The Final Guidance was published in the Federal Register at 71 Fed. Reg. 58,609, 58,618.

48.        The Final Guidance applies to "all residential mortgage loan products that allow borrowers to defer repayment of principal or interest," including "all interest-only products and negative amortization mortgages," except for reverse mortgages.   It defines "nontraditional mortgage loans" to include interest-only mortgages and Option ARMs.

49.        The Final Guidance emphasized that many nontraditional mortgages were untested under stressed economic conditions, particularly loans that include risk-layering features such as less stringent income and asset verification requirements (i.e., "reduced documentation" basis loans).

50.        The Final Guidance counseled banks to implement stress testing of nontraditional loan portfolios and a robust ALLL methodology as part of their respective strategies to manage and mitigate risks presented by nontraditional loans.

**A.        Final Guidance:  ALLL**

51.        The Final Guidance stated:

[Institutions should establish] appropriate ALLL levels that consider the credit quality of the portfolio and conditions that affect collectibles ....

*** 

Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios. They should also consider the higher risk of loss posed by layered risks when establishing their ALLL.

- 15 -

> [I]nstitutions should recognize that their limited performance history with these products, particularly in a stressed environment, increases performance uncertainty.

Final Guidance, 71 Fed. Reg. at 58,616.

52.    The Final Guidance further stated that when establishing an appropriate ALLL, "institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics."  Specifically,

> The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Segments could also differentiate loans by payment and portfolio characteristics, such as loans on which borrowers usually make only minimum payments, mortgages with existing balances above original balances, and mortgages subject to sizable payment shock. The objective is to identify credit quality indicators that affect collectibility for ALLL measurement purposes.

Final Guidance, 71 Fed. Reg. at 58,616.

53.    The Final Guidance also stated that "understanding characteristics that influence expected performance also provides meaningful information about future loss exposure that would aid in determining adequate capital levels."

54.    Capital levels are financial ratios that generally provide information about a banking institution's ability to cover future withdrawals.  The ratios compare the amount of capital maintained by a bank to its assets.  When a bank's capital levels decrease there is a corresponding decrease in the bank's ability to pay-out on withdrawal requests, which increases the likelihood of insolvency.  Capital levels are important metrics Bank Regulators closely monitor.

- 16 -

### B.    Final Guidance: Stress Testing

55.    Regarding stress testing, the Final Guidance stated that institutions should perform sensitivity analyses on key portfolio segments to identify and quantify events that may increase risks in the portfolio.  The Final Guidance further stated that the sensitivity analyses "should generally include stress tests on key performance drivers such as interest rates, employment levels, economic growth, housing value fluctuations, and other factors beyond the institution's immediate control," and that stress tests "typically assume rapid deterioration in one or more factors and attempt to estimate the potential influence on default rates and loss severity."

56.    The Final Guidance explained how stress testing would benefit a bank's risk management policies, stating that: "Stress testing should aid an institution in identifying, monitoring and managing risk, as well as developing appropriate and cost effective loss mitigation strategies.  The stress testing results should provide direct feedback in determining underwriting standards, product terms, portfolio concentration limits, and capital levels."

## V.    **Bank Regulators Issue ALLL Policy Statement**

57.    On December 13, 2006, Bank Regulators issued an Interagency Policy Statement on ALLL ("2006 ALLL Policy Statement"), which replaced the 1993 Interagency Policy Statement on ALLL.  The 2006 ALLL Policy Statement stated:  "The ALLL represents one of the most significant estimates in a [bank or bank holding company's] financial statements and regulatory reports.  Because of its significance, each institution has a responsibility for developing, maintaining and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL . …"  Defendants

- 17 -

had a fiduciary duty to the Holding Company to ensure this responsibility was fulfilled, so that accurate financial statements could be issued by the Holding Company and presented to the Holding Company's Board.

58.    The 2006 ALLL Policy Statement further stated:  "An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio."

59.    The 2006 ALLL Policy Statement emphasized that banks could not rely solely on historical losses or recent trends in losses to determine the appropriate ALLL.  In this regard, it stated:

> While historical loss experience provides a reasonable starting point for the institution's analysis [of the ALLL], historical losses, or even recent trends in losses, do not by themselves form a sufficient basis to determine the appropriate level for the ALLL.  Management should also consider those qualitative or environmental factors that are likely to cause estimated credit losses associated with the institution's existing portfolio to differ from historical loss experience, including but not limited to:
>
> - Changes in lending policies and procedures, including changes in underwriting standards and collection, charge-off, and recovery practices not considered elsewhere in estimating credit losses.
>
> - Changes in international, national, regional, and local economic and business conditions and developments that affect the collectibility of the portfolio, including the condition of various market segments.
>
> - Changes in the nature and volume of the portfolio and in the terms of loans.
>
> - Changes in the experience, ability, and depth of lending management and other relevant staff.
>
> - Changes in the volume and severity of past due loans, the volume of nonaccrual loans, and the volume and severity of adversely classified or graded loans.
>
> - Changes in the quality of the institution's loan review system.

- 18 -

- Changes in the value of underlying collateral for collateral-dependent loans.
- The existence and effect of any concentrations of credit, and changes in the level of such concentrations.
- The effect of other external factors such as competition and legal and regulatory requirements on the level of estimated credit losses in the institution's existing portfolio.

2006 ALLL Policy Statement at 8-9.

60.     According to the 2006 ALLL Policy Statement, "An institution's failure to analyze the collectibility of the loan portfolio and maintain and support an appropriate ALLL in accordance with GAAP and supervisory guidance is generally an unsafe and unsound practice."  2006 ALLL Policy Statement at 5.

## VI.   Defendants Fail to Ensure the Timely Implementation of Effective Risk Assessment Procedures and Internal Controls over Financial Accounting as Prescribed by Regulators

### A.   Robust Stress Testing Is Not Performed Until 2008 at the Earliest

61.     Both the December 2005 Proposed Guidance and September 2006 Final Guidance expressed serious concerns by Bank Regulators that nontraditional mortgage products such as Option ARM loans had not been tested during stressed economic conditions.

62.     By late 2006, the residential real estate markets in Florida, California, Nevada and in other markets where the Bank originated Option ARMs were declining.

63.     These negative economic developments underscored the need to conduct robust stress testing to assess accurately the impact the Bank's nontraditional loan portfolio would have on the financial condition of the Bank and the Holding Company if the declining economic conditions persisted or the conditions worsened.

- 19 -

64.     In January 2007, the Office of Thrift Supervision ("OTS"), the Holding Company's and the Bank's primary regulator, criticized the Bank for its failure to conduct robust stress testing to evaluate reliably the risks created by the Bank's substantial Option ARM portfolio. The OTS directed the Bank to develop and implement a methodology for stress testing the Option ARM portfolio by March 31, 2007.

65.     In March 2007, the Bank's board of directors (the "Bank's Board") adopted a "Nontraditional Mortgage Policy," which purported to address material elements of the Final Guidance. The Nontraditional Mortgage Policy stated that the Bank would perform semi-annual stress testing on key segments of the Bank's nontraditional mortgage portfolio. Regarding the ALLL, the Nontraditional Mortgage Policy stated that current historical data does not support additional loan loss factors based on stratifications in the option ARM portfolio, and that (contrary to the Final Guidance) Option ARMS would not be segregated when analyzing the appropriateness of the ALLL.

66.     On August 27, 2007, the OTS was told that a stress testing methodology was being developed, and that so-called "basic" stress testing would be implemented by September 2007, with a "robust" stress test methodology to be implemented in 2008.

67.     Through August 27, 2007, under the leadership of Defendants, the Holding Company had not required the Bank to perform, or devise a methodology to perform, even "basic" stress testing of the Option ARM portfolio.

68.     Throughout 2007, the Bank's loan portfolio deteriorated significantly. Nonperforming loans increased from $44.7 million for the quarter ending December 31, 2006 to $180.8 million for the quarter ending September 30, 2007—more than a fourfold increase. The percentage of negatively amortizing loans also increased substantially. While

- 20 -

80 percent of the Option ARMs were negatively amortizing for the quarter ending December 31, 2006, nearly 90 percent were negatively amortizing by the quarter ending September 30, 2007. This increase portended a severe deterioration in the performance of the Bank's residential loan portfolio.

69. It was not until November 16, 2007, however, that what was described as a "basic" stress test model for the Option ARM portfolio was developed and a "test run" of this model conducted.

70. In January 2008, the Bank's Board and the Holding Company's Board were advised by the Bank's management that "a more robust stress testing model (which will likely include housing price appreciation [and] credit/loss mitigation factors)" would be developed by March 2008.

71. Through March 2008, under the leadership of Defendants, the Holding Company had not required the Bank to conduct the robust stress testing of the Option ARM portfolio prescribed by the Final Guidance and required by the OTS to have been due by March 2007. As a result, the risks associated with the Option ARM portfolio could not be assessed or managed properly, nor could accurate information about the financial condition of the Holding Company and the Bank be provided to the Holding Company's Board through at least March 2008.

### B.    The ALLL Methodology Remains Inadequate Through 2008

72. In January 2007, the OTS advised that the Company's ALLL methodology did not comply fully with the Final Guidance. The OTS directed that a more robust ALLL

- 21 -

methodology that satisfied all of the criteria described in the Final Guidance be developed by March 31, 2007.

73.     Although the March 2007 Nontraditional Mortgage Policy purported to address the Final Guidance, in August 2007, the OTS advised that the ALLL methodology as described in the Nontraditional Mortgage Policy was inconsistent with the Final Guidance. The OTS directed that the ALLL methodology be upgraded to conform fully to the Final Guidance.

74.     In July 2008, the Holding Company belatedly retained Promontory Financial Group, LLC ("Promontory") to develop a comprehensive ALLL model that would meet all of the regulatory criteria.  Promontory is a consulting firm to financial institutions that assists them in meeting regulatory requirements and strengthening credit and risk management controls.

75.     In August 2008, the OTS again criticized the Company's ALLL methodology, noting this time that the methodology failed to conform fully with the 2006 ALLL Policy Statement.

76.     For example, the 2006 ALLL Policy Statement instructed financial institutions to "periodically validate the ALLL methodology," and that the "validation process should include procedures for a review, by a party who is independent of the institution's credit approval and ALLL estimation process."  Through August 2008, the Holding Company, under the leadership of Defendants, had not required the implementation of such a validation process.

77.     The 2006 ALLL Policy Statement also instructed financial institutions to implement ALLL policies having "an effective loan review system and controls" "responsive

- 22 -

to changes in internal and external factors affecting the level of credit risk in the portfolio."
Yet, through August 2008, the ALLL values reflected in the Company's financial statements
were calculated using initial in-house evaluations performed when a loan became greater
than 180 days delinquent to determine the "fair value of residential properties" and establish
losses on loans greater than 180 days past due. The "fair value" figure was not updated on
even a quarterly basis to reflect rapidly deteriorating market conditions and any continued
decline in real property values. And because the evaluations were not appraisals, the
evaluations did not take into consideration the actual condition of the property underlying the
loan. Moreover, there had been no formal comparisons between the in-house evaluations to
the actual appraisals obtained on those properties which were foreclosed in order to assess
the reliability of the in-house evaluations and adjust for material variance.

78.     Under the leadership of Defendants, an ALLL methodology that did not
comply fully with the 2006 ALLL Policy Statement had been permitted to be maintained
through August 2008.

79.     The OTS identified these and other deficiencies in the ALLL
methodology, and in August 2008, directed that the ALLL methodology be conformed fully
to the 2006 ALLL Policy Statement and the Final Guidance.

80.     By September 19, 2008, however, the ALLL methodology remained
deficient, and the OTS issued cease and desist orders to the Holding Company and the Bank.

81.     Evidencing the fact that the Holding Company, under the leadership of
Defendants, had failed to require the Bank to employ a compliant ALLL methodology, the
cease and desist order to the Holding Company (the "Holding Company's Order") required

- 23 -

the Holding Company to, among other things, ensure that the Bank complies with all the terms of the cease and desist order issued to the Bank (the "Bank's Order").

82.     The Bank's Order directed the Bank's Board to prepare and submit a detailed plan regarding the ALLL to ensure that the Bank:

> maintains and adheres to ALLL policies, procedures, timeframes, and calculation inputs and criteria that provide for the timely establishment and maintenance of adequate and appropriate ALLL (ALLL Program). The ALLL Program shall, at a minimum: (a) address the concerns and recommendations noted in the 2008 Examination; and (b) fully comply with (i) Generally Accepted Accounting Principles (GAAP), (ii) OTS Chief Executive Officer Letter No. 250 (December 13, 2006) [which incorporated the 2006 ALLL Policy Statement], (iii) Section 261 of the OTS Examination Handbook, and (iv) all other applicable regulatory guidance regarding ALLL. The [Bank's] Board shall make any changes to the ALLL Program required by the Regional Director within thirty (30) days after receipt. Thereafter, the Board shall adopt and ensure that the revised ALLL Program is fully implemented and adhered to by the [Bank].

83.     The Bank's Order found inadequate the methodology used to determine the ALLL values reported in the Holding Company's consolidated financial statements presented to the Holding Company's Board and filed with the SEC.

84.     By October 2008, the ALLL model developed with assistance from Promontory was submitted to the OTS.  The OTS did not deem even the Promontory-assisted model to be fully compliant with the Bank's Order.  The OTS nonetheless found the Promontory-assisted ALLL model to be a vast improvement over the ALLL methodology previously employed.

85.     From the Holding Company's initial engagement of Promontory in July 2008 to October 2008, a period of only four months was required to upgrade the ALLL methodology to a level approaching compliance with OTS directives and regulatory policy. Only after being prompted by the threat of sanction from the OTS did the Holding Company,

- 24 -

under Defendants' leadership, finally cause the necessary resources to be committed to bringing the ALLL methodology into compliance.

86.       After October 2008, Promontory continued working with the Holding Company and the Bank to improve the ALLL methodology.

87.       Because Defendants, who were responsible, in their respective capacities as CEO and CFO of the Holding Company, for seeing to it that effective internal controls and procedures were implemented to ensure accurate execution of account level analyses of the ALLL in accordance with OTS directives, the 2006 Policy Statement, and the Final Guidance, failed to fulfill their responsibilities, the Holding Company was unable to make a timely filing with the SEC of its Form 10-K for Fiscal Year 2008 and ultimately did not file it at all.

88.       In its notice of late filing of its 2008 Form 10-K (its 2008 Form NT 10-K), filed on December 16, 2008, the Holding Company announced that, although its ALLL analysis had not been completed, it expected to report a loss of at least $327 million for the preceding quarter.

89.       Defendants publicly conceded in the 2008 Form NT 10-K that the implementation and execution of the Holding Company's "controls and procedures did not ensure the systematic and accurate execution of account level analyses related to the residential loan portfolio, including the [ALLL]."

90.       Because of the delayed development and implementation of a compliant ALLL methodology, the Holding Company was unable to make a timely filing with the SEC of its Form 10-Q for the quarter ending December 31, 2008 and its Form 10-Q for the quarter ending March 31, 2009.

- 25 -

91.     In the Holding Company's notice of late filing of its Form 10-Q for the quarter ending March 31, 2009 (its 2Q 2009 Form NT 10-Q), which was filed on May 12, 2009, the Company again announced it had identified "material weaknesses" in its "internal control over financial reporting," including the failure of the Company's "controls and procedures" to "ensure the systematic and accurate execution of account level analyses related to the residential loan portfolio, including the [ALLL]."

92.     The Holding Company further announced it did not prepare its consolidated financial statements for Fiscal Year 2008, the 1Q 2009, or the 2Q 2009 because of "continuing adverse market conditions, the complexity of accounting and disclosure issues, which increased the need for additional review and analysis of our business including, without limitation, regulatory issues, liquidity and capital[,] and the material weaknesses in internal control over financial reporting."

93.     The Holding Company's 2Q 2009 Form NT 10-Q included financial data the Company characterized as "preliminary," including the following ALLL values: $711,995,000 for the 4Q 2008; $926,639,000 for 1Q 2009; and $991,185,000 for 2Q 2009. In reporting these values, the Holding Company announced that the data was "unaudited" and "subject to change."

94.     Notably, these "preliminary" ALLL values were several times greater than the ALLL values reported in the corresponding quarters for Fiscal Years 2007 and 2008: $58,623,000 for the 4Q 2007; $117,658,000 for the 1Q 2008; and $202,315,000 for the 2Q 2008.

C.    **Defendants Breached the Fiduciary Duty of Care by Failing to Ensure the Timely Implementation of Effective Risk Assessment and Financial Accounting Mechanisms from 2006 through 2008**

95.    As CEO and CFO of the Holding Company, respectively, Defendants were responsible for ensuring the implementation of effective internal risk management procedures to enable the Holding Company to assess and manage the risks in the Bank's Option ARM portfolio and to provide accurate assessments of the Holding Company's consolidated financial condition in financial statements presented to the Holding Company's Board and to the investing public.  Defendants owed a fiduciary duty to the Holding Company to ensure the accuracy of the Holding Company's financial reporting, including accurately representing the risks in the Option ARM portfolio and the probable losses arising from borrower delinquencies.  As officers of the Holding Company, Defendants had an affirmative responsibility to ensure they and the Holding Company's Board received timely, accurate, and complete assessments of the Company's risks exposure.  Defendants failed in this responsibility.

96.    The rapid deterioration in the housing market and the deteriorating performance of the Bank's Option ARM portfolio in 2007 and 2008 underscored the need for Defendants to perform these duties with care and in the best interest of the Holding Company.

97.    Yet, despite pronouncements in the Proposed Guidance (issued in December 2005), the Final Guidance (issued in September 2006), and OTS directives (issued throughout 2007) emphasizing the role of robust stress testing in managing risks, Defendants, as the most senior officers of the Holding Company, failed, until March 2008 at the earliest, to see to it that robust stress testing of the Option ARM portfolio was implemented.

- 27 -

98.     In addition to the delay in the implementation of robust stress testing, notwithstanding the pronouncements regarding the importance of implementing an appropriate ALLL methodology in the Proposed Guidance (issued in December 2005), the Final Guidance (issued in September 2006), the 2006 ALLL Policy Statement (issued in December 2006), and OTS directives to the Bank (issued throughout 2007 and 2008), Defendants failed, until Promontory was engaged in July 2008, to take steps reasonably calculated to result in the implementation of effective controls and procedures that would have enabled the Holding Company accurately to determine and report ALLL values during the Relevant Period and avoid presenting incorrect financial information to the Holding Company's Board and others.

99.     Had Defendants timely acted in response to the 2005 Proposed Guidance by committing the necessary time, resources, and personnel to the project, a reliable ALLL methodology could have been developed in a matter of months—that is, by May or June 2006.

100.     Had Defendants timely acted in response to the Final Guidance and the 2006 ALLL Policy Statement, a reliable ALLL model could have been developed in a matter of months—that is, by May or June 2007.

101.     Instead, even as the decline in the housing market accelerated and the deterioration in the performance of the Bank's Option ARM portfolio accelerated throughout 2007 and 2008, Defendants failed, until Promontory was retained in July 2008, to take steps reasonably calculated to result in the implementation of a reliable ALLL methodology.

- 28 -

102.     As a result, in its 2008 Form NT 10-K filed on December 16, 2008, the Holding Company admitted the failure of "the Company's controls and procedures" to "ensure the systematic and accurate execution of account level analyses related to the residential loan portfolio, including the [ALLL]," constituted a "material weakness" in its "internal controls over financial reporting" as of September 30, 2008. And for the quarter ending September 30, 2008 through the quarter ending March 31, 2009—the last full fiscal quarter before the Holding Company declared bankruptcy—the Holding Company only reported "preliminary" ALLL values that were "unaudited" and still "subject to change."

103.     Defendants failed in their responsibilities, as CEO and CFO, respectively, of the Holding Company, to ensure timely implementation of risk management procedures to enable the Holding Company to assess effectively and manage the risks in the Bank's Option ARM portfolio and to provide accurate assessments of the Holding Company's consolidated financial condition. Defendants also failed in their responsibilities, as CEO and CFO, respectively, of the Holding Company, to ensure timely implementation of effective internal controls over financial reporting to enable the Holding Company and its subsidiaries accurately to account for and report the Holding Company's financial results on a consolidated basis.

104.     These failures resulted in a misconception by the Holding Company's Board of (1) the magnitude of the risk posed by the Bank's Option ARM portfolio to the viability of the Holding Company and the Bank, and (2) the true financial condition of the Bank and the Holding Company.

105.     Had Defendants not breached their fiduciary duties to the Holding Company in the manner described above, and had the Holding Company's Board been made

- 29 -

aware of the true financial condition of the Holding Company and the Bank, the Holding Company's Board would have been in a position to make informed decisions about the wisdom of having the Holding Company continue to repurchase its stock, pay dividends, and contribute capital to the Bank, and about correcting the Holding Company's and the Bank's unsafe and unsound banking practices.

## VII. Defendants' Failures Deprive the Holding Company's Board of Accurate Information Critical to the Board's Decision-Making Process

106.    During Fiscal Year 2007, notwithstanding the lack of a reliable ALLL calculation methodology, Defendants represented to the Holding Company's Board that the quarterly ALLL values were adequate to account for probable losses arising from borrower delinquencies.

107.    During Fiscal Years 2007 and 2008, Defendants represented to the Holding Company's Board that the Bank's underwriting requirements, such as requiring high credit scores for borrowers and conservative loan-to-value ratios, adequately mitigated the risks presented by the Option ARM portfolio.

108.    These representations are illustrated by statements set forth in the Holding Company's consolidated financial statements filed with the SEC, upon which the Holding Company's Board relied in making decisions, including decisions about the Holding Company's infusion of capital into the Bank, issuance of debt, repurchase of Company stock, and declaration of dividends.

109.    For example, the Holding Company's 2007 Form 10-K (for the Fiscal Year ending September 30, 2007) and 1Q 2008 Form 10-Q (for the quarter ending December 31, 2007) state that "[t]he various risks of" the Holding Company's "loan portfolio are

- 30 -

mitigated by" the Company's "underwriting requirements, which include credit qualifications and LTV ['loan-to-value'] ratios directly correlated to potential risk."

110.    In addition, the Holding Company's 2007 Form 10-K, and the Form 10-Qs for the quarters ending March 31, 2007, June 30, 2007, December 31, 2007, March 31, 2008, and June 30, 2008 represented that the reported ALLL value was "established and maintained at levels that management believes are adequate to cover probable losses resulting from the inability of borrowers to make required payments on loans." The Holding Company's Form 10-Q for the quarter ending March 31, 2007 also represented that the ALLL was established at a level that "management believes to be appropriate given the composition of its loan portfolio."

111.    Yet, because Defendants, as CEO and CFO, respectively, of the Holding Company, had failed to ensure the timely implementation of robust stress testing and failed to see to it that an ALLL methodology fully compliant with applicable regulatory directives and policy was developed and implemented in a timely manner, the ALLL values presented to the Holding Company's Board did not paint an accurate picture of (1) the risk to the Holding Company and the Bank inherent in the Option ARM portfolio, or (2) the financial condition of the Holding Company and the Bank.

112.    Consequently, the Holding Company's Board was unable to make, on a well-informed basis, decisions that affected materially the interests of the Holding Company and its stakeholders.

US2008 1144828.19

**VIII.** **Relying on the Flawed Financial Information Provided by Defendants, the Company's Board Authorizes Capital Draining Stock Repurchases, Wasteful Dividend Payments, and Debt Issuances**

113.     The Holding Company's Board relied on the flawed information provided to them by Defendants and incorporated into the Holding Company's public filings, which masked the magnitude of the risk inherent in the Option ARM portfolio, when authorizing the Holding Company to repurchase the Holding Company's publicly traded stock through the quarter ending September 30, 2007, to pay dividends on the Holding Company's stock through the quarter ending June 30, 2008, and to issue additional debt based on disclosures to the investing public without taking other actions to reduce risks presented to the Option ARM portfolio.  Investors would not have purchased the Holding Company's debt on the terms offered had they known the true financial condition of the Holding Company and the Bank.

**A.**     **The Holding Company Repurchases Stock Through the Quarter Ending September 30, 2007**

114.     On October 24, 2002, the Holding Company's Board approved a stock repurchase program for the Holding Company's Class A Common Stock (the "Repurchase Program"), in the belief that the market price at that time did not reflect the real value of the Holding Company's stock.

115.     The Repurchase Program authorized the Holding Company to repurchase up to 1 million shares of Class A Common Stock in open market transactions at prices and on conditions determined by the Executive Committee of the Holding Company's Board, which was chaired by Defendant Camner.

- 32 -

116.     By April 2007, the Holding Company's Board increased the number of shares authorized to be repurchased to 4.4 million shares.  Earlier increases had raised the authorization to 3 million shares in October 2006, and then to 3.6 million shares in January 2007.

117.     During the quarter ending March 31, 2007, the Holding Company repurchased 356,282 shares at an average price of $24.85 per share, at a total cost of at least $8,853,608.  During the quarter ending June 30, 2007, the Holding Company repurchased 936,600 shares at an average price of $21.90 per share at a total cost exceeding $20,511,540. During the quarter ending September 30, 2007, the Holding Company repurchased approximately 315,413 shares of the Holding Company's stock.  The Company's Class A Shares traded at a low of $13.64 per share and a high of $20.48 per share during this quarter. Assuming an average share price of approximately $17.00 per share, the Holding Company expended approximately $5,362,021 on stock repurchases during the quarter ending September 30, 2007.

118.     These stock repurchases drained capital from the Holding Company at a time the Bank's Option ARM loan portfolio was deteriorating and the true financial condition of the Holding Company and Bank were unknown because Defendants, in their respective capacities as CEO and CFO of the Holding Company, had failed to cause to be implemented, in a timely manner, robust stress testing of the Option ARM portfolio and a reliable ALLL methodology conforming to OTS directives and regulatory policy.

119.     Defendants did not advise the Holding Company's Board to suspend the Repurchase Program in order to preserve capital until October 2007.

- 33 -

120.     Because robust stress testing and a reliable ALLL methodology conforming to OTS directives and regulatory policy were not implemented in a timely manner, the Holding Company's Board was lulled by the financial information reported by the Holding Company into not withdrawing the Executive Committee's authorization to repurchase stock until after the stock repurchases in 2007 described above already had occurred.

**B.     The Holding Company Continues Issuing Debt through September 2007**

121.     The Holding Company's Board approved several debt offerings beginning in late 2006 and ending in September 2007 based on information about the respective financial conditions of the Holding Company and the Bank that was prepared without the benefit of timely implementation of stress testing of the Option ARM portfolio and a reliable ALLL methodology conforming to OTS directives and regulatory policy.

122.     On September 7, 2007, the Holding Company's Board authorized an offering of trust preferred securities.  Pursuant to this authorization, on or about September 20, 2007, $7.5 million in trust preferred securities were issued.

123.     On September 24, 2007, the Holding Company's Board authorized another debt offering, pursuant to which $12.5 million in junior subordinated debentures were issued on September 28, 2007.

124.     If robust stress testing of the Option ARM portfolio and a reliable ALLL methodology conforming to OTS directives and regulatory policy had been implemented in a timely manner, the impact on the Holding Company's financial statements would have dissuaded investors from subscribing to the trust preferred securities and the junior

- 34 -

subordinated debentures on the terms offered in September 2007, and the Holding Company would not have incurred the additional $20 million of debt, which prolonged the life of the Holding Company and deepened its insolvency.

125.     The breaches of fiduciary duties to the Holding Company by Defendants with respect to the failure to implement, in a timely manner, robust stress testing and a reliable ALLL methodology, as described above, resulted in the futile prolongation of the life of the Holding Company and the deepening of its insolvency, for which Defendants are liable to the Holding Company's bankruptcy estate.

### C.     The Holding Company Continues Declaring Dividends on its Stock Through May 2008

126.     The Holding Company's Board declared dividends of $0.005 per share on the Company's Class A Common Stock and $.1375 per share on the Company's Series B Preferred Stock on or about March 5, 2007, May 31, 2007, August 29, 2007, November 30, 2007, February 29, 2008, and May 27, 2008.  These dividends were paid on or about March 30, 2007, June 28, 2007, September 28, 2007, December 31, 2007, March 31, 2008, and June 30, 2008, respectively.  From March 2007 through June 2008, the Holding Company paid dividends in the amount of approximately $1,057,000 on the Company's Class A Common Stock, and approximately $956,000 on the Company's Series B Preferred Stock, for a total of approximately $2,013,000.

127.     It was not until on or about August 5, 2008 that the Holding Company's Board voted to suspend the declaration and payment of dividends on the Holding Company's Class A Common Stock "as a means of preserving capital."

US2008 1144828.19

128.    If robust stress testing of the Option ARM portfolio and a reliable ALLL methodology conforming to OTS directives and regulatory policy had been implemented in a timely manner, giving the Holding Company's Board a more accurate and complete picture of the Holding Company's financial condition at the time the dividends described above were declared and paid, the Board would have suspended dividends before the 2007 and 2008 dividends were declared and paid to preserve capital and avoid the risk of authorizing illegal dividends, and the approximately $2 million would have been retained in the Holding Company.

129.    The breaches of fiduciary duties to the Holding Company by Defendants with respect to the failure to implement, in a timely manner, robust stress testing and a reliable ALLL methodology, as described above, divested the Holding Company of approximately $2,013,000 in dividend payments for which Defendants are liable in damages to the Holding Company's bankruptcy estate.

## IX.   The Holding Company Unsuccessfully Attempts to Raise Capital and Contributes $80 Million in Capital to the Bank in August 2008

130.    The Holding Company's 2007 Form 10-K (for the Fiscal Year ending September 30, 2007) stated that its "capital position is strong."

131.    In September 2007, Defendants sought investors for the Holding Company or Bank, including at least one Spanish-based bank.  In October 2007, Defendants told the Holding Company's Board that such an investment was unlikely to occur, and Defendants would explore other capital-raising avenues.

132.    On January 2, 2008, the Holding Company filed a Form S-3 shelf registration with the SEC ("January 2008 Shelf Registration"), to register securities in an

- 36 -

amount up to $400 million. The Holding Company announced it intended "to use the net proceeds of the offering for general corporate purposes," which "may include funding working capital needs, possible acquisitions, [and] acquiring our debt and equity securities, if available on favorable terms." The Holding Company never issued securities registered under the January 2008 Shelf Registration.

133.    As part of their capital raising efforts, Defendants engaged in discussions and negotiations with private equity firms and investment banks throughout 2008.

134.    On January 24, 2008, the Holding Company announced a multi-year strategic plan ("Strategic Plan") to transition the Bank to a retail commercial bank. As part of the Strategic Plan, the Holding Company announced it closed four of its nine sales offices and reduced its wholesale residential staff by more than 45 percent.

135.    In a Form 8-K filed on May 12, 2008, the Holding Company announced that as part of its Strategic Plan, the Bank would no longer originate Option ARMs except for "private banking customers" and that it was "exploring capital-raising alternatives."

136.    On or about June 18, 2008, the Holding Company filed with the SEC a preliminary prospectus to support the $400 million stock offering. On June 24, 2008, the Holding Company filed a Form 8-K announcing an agreement concerning the holders of its Series B Preferred Stock and Class B Common Stock (the "Supervoting Shares"). Under the agreement, holders of the Supervoting Shares, including Defendant Camner, agreed to convert those shares to Class A Common Stock if the Holding Company successfully raised $400 million through a sale of securities.

137.    By July 2008, the Holding Company abandoned efforts for a public offering and shifted its capital-raising efforts to private equity investors. The Holding

- 37 -

Company could not raise capital because the Bank's Option ARM portfolio continued to deteriorate, and potential investors harbored deep concerns regarding their inability to estimate the potential losses in the Option ARM portfolio during their due diligence efforts.

138.    In response to the continued deterioration in the Bank's Option ARM portfolio, on July 24, 2008, the OTS advised the Holding Company and the Bank that the Bank needed a capital infusion.

139.    The Holding Company entered into a Memorandum of Understanding (the "HC MOU") with the OTS on or about July 24, 2008, in which the OTS stated, "the deterioration in BankUnited's nontraditional mortgage loan portfolio has caused the Bank, which represents the primary asset of the [Holding Company], to be in need of: (i) additional capital from [the Holding Company]; and (ii) certain other corrective actions."  The HC MOU contemplated the Holding Company's Board would prepare and then implement a plan to raise at least $400 million in additional capital.  The OTS had made clear $400 million was the minimum the OTS would consider acceptable.

140.    The Bank also entered into a separate Memorandum of Understanding (the "Bank MOU") with the OTS on or about July 24, 2008, in which the Bank agreed to achieve and maintain capital ratios at 8 percent core and 15 percent risk-based until the OTS agreed to relax those requirements.

141.    The OTS issued an Examination Report in early August 2008 and advised the Bank that its "rapidly deteriorating asset quality, rising loan losses, continued projected operating losses, poor tangible capital ratios at the holding company level, as well as liquidity issues give cause for continued capital concerns."  The OTS further noted the

- 38 -

Holding Company's ability to raise capital was uncertain given the then-current condition of the Bank and negative trends.

142.    In short, based on the Holding Company's lack of success in raising capital and the communications received from the OTS, by August 2008, there was no realistic prospect for salvaging the Holding Company's investment in the Bank, and any further investment by the Holding Company in the Bank would be futile and divest the Holding Company of assets with no resulting benefit to the Holding Company.

143.    On or about August 5, 2008, Defendant Camner advised the Holding Company's Board that the OTS had ordered the Holding Company to make an $80 million capital contribution to the Bank and to backdate the contribution to June 30, 2008.

144.    Notwithstanding that no realistic prospect for the Bank's survival existed, the $80 million capital infusion was presented to the Holding Company's Board by Camner as a *fait accompli*; as a matter about which the Holding Company had no choice.

145.    Before advising the Holding Company's Board regarding the $80 million capital contribution, Camner, in breach of his duties of care and loyalty to the Holding Company, (a) did not analyze and evaluate, or seek the advice of the Holding Company's auditor or other financial personnel within the Holding Company's management regarding whether and for how long such a contribution would enable the Bank to obtain and maintain the capital levels and ratios that the Bank had agreed to achieve and maintain pursuant to the Bank MOU; (b) did not analyze and evaluate whether and for how long contributing $80 million to the Bank at that juncture would enable the Bank to avoid or delay the initiation of enforcement action by the OTS; (c) did not analyze and evaluate whether and for how long contributing $80 million to the Bank at that juncture would enable the Bank to continue

- 39 -

operating as a going concern and avoid regulatory seizure in light of the prolonged and continued inability of the Holding Company to raise capital and the continued rapid deterioration in the Bank's Option ARM portfolio; and (d) did not provide the Board with all information relevant to making the decision that was reasonably available ("Relevant Information").

146.    In presenting the Holding Company's Board with the *fait accompli*, Defendant Camner, in breach of his duties to the Holding Company, failed to (a) disclose that neither he nor any other member of the Holding Company's management had analyzed or evaluated whether and for how long an $80 million contribution would enable the Bank to maintain the capital levels and ratios that the Bank had agreed to achieve and maintain pursuant to the Bank MOU; (b) disclose that neither he nor any other member of the Holding Company's management had analyzed and evaluated whether and for how long contributing $80 million to the Bank at that juncture would enable the Bank to avoid or delay the initiation of enforcement action by the OTS; (c) allow the Holding Company's Board time to deliberate and exercise its independent judgment about the legal, regulatory, and financial implications of making the $80 million contribution and backdating it as effective June 30, 2008; and (d) provide the Holding Company's Board with Relevant Information or allow the Holding Company's Board time to deliberate and exercise its independent judgment about whether and for how long contributing $80 million to the Bank at that juncture would (i) prevent or delay the initiation of enforcement action by the OTS or (ii) enable the Bank to avoid closure by the OTS and seizure by the FDIC, in light of the prolonged and continued inability of the Holding Company to raise capital and the continued rapid deterioration in the Bank's Option ARM portfolio.

147.    Having been presented with a *fait accompli* and having not been provided with Relevant Information and a reasonable time to deliberate, on August 5, 2008, the Holding Company's Board, with little discussion, authorized an $80 million capital contribution from the Holding Company to the Bank, which was recorded as effective June 30, 2008 in the Bank's Thrift Financial report.

148.    On or about August 5, 2008, as a result of Camner's breaches of his fiduciary duties of care and loyalty in his capacity as CEO of the Holding Company, the Holding Company contributed $80 million in capital to the Bank, even though there was no realistic prospect for the Bank's survival.  The Holding Company received nothing of value for this contribution and lost $80 million by making the contribution.  The Holding Company's bankruptcy estate is entitled to recover this $80 million loss from Defendant Camner as damages for breach of his fiduciary duties to the Holding Company as CEO of the Holding Company.

## X.    Defendants' Failure to Prevent the Holding Company from Engaging in Unsafe and Unsound Practices, Resulting in the Bank Being in an Unsatisfactory Condition, Leads to the Closing of the Bank by the OTS and the Holding Company's Bankruptcy

149.    Defendants continued their attempts to raise capital in the August through October 2008 period.  These efforts were not successful.

150.    On September 16, 2008, less than a month and a half after the $80 million capital contribution from the Holding Company to the Bank, the OTS notified the Holding Company's Board that the deterioration in the Option ARM portfolio "has resulted in the need for greater levels of capital and allowance for loan and lease losses [ALLL] at the Bank," and that a "Cease and Desist Order" was necessary to address the deficiencies noted

US2008 1144828.19

in the January 31, 2008 Report of Examination.  Accompanying the September 16, 2008

OTS notification was a "Stipulation and Consent to Issuance of Order to Cease," which the

OTS directed the Holding Company's Board to sign and return.

151.    On or about September 19, 2009, the OTS issued cease and desist orders to

the Holding Company (the "Holding Company's Order") and the Bank (the "Bank's Order").

The "OTS Findings of Fact" incorporated into the Holding Company's Order stated that:

> Based on [the OTS's] January 31, 2008 Report of Examination of the Holding
> Company, the OTS finds that the **Holding Company** has engaged in unsafe
> and unsound practices that have resulted in the Holding Company's wholly
> owned savings association subsidiary, BankUnited, FSB, [the Bank] ... being
> in an unsatisfactory condition primarily due to the rising delinquencies and
> defaults in its payment option arm loan portfolio, a significant portion of
> which was originated on a "stated income" basis.  The deterioration in this
> portfolio has resulted in the need for greater levels of capital and allowance for
> loan and lease losses at the [Bank].  (emphasis added).

152.    In their respective positions as CEO and CFO of the Holding Company,

Camner and Lopez had fiduciary duties to the Holding Company to manage the Holding

Company in a manner such that the Holding Company did not engage in unsafe and unsound

practices resulting in the condition of the Bank becoming unsatisfactory to the OTS.  As

evidenced by the Holding Company's Order, Defendants breached these duties by, *inter alia*,

vigorously promoting Option ARM lending even after the downturn in the housing market

had begun, permitting Option ARM loans to predominate in the residential mortgage loan

portfolio, permitting a significant portion of residential mortgage loans originated by the

Bank to be made on a stated income, no documentation or reduced documentation basis, and

permitting other lax underwriting standards to be employed in the origination of residential

mortgage loans.

- 42 -

153.     The Holding Company's Order (a) required the Holding Company to raise capital for the Bank, (b) required the Holding Company to ensure the Bank complied with the Bank's Order, and (c) imposed restrictions on the Holding Company's use of existing capital.

154.     Regarding the Bank, the Issuance and Consent to Issuance of Order to Cease and Desist (the "Bank's OTS Stipulation") provided as "OTS Findings of Fact" that:

> Based on [the OTS's] January 31, 2008 Report of Examination of the [Bank], the OTS finds that the [Bank] has engaged in unsafe and unsound practices that have resulted in the [Bank] being in an unsatisfactory condition, primarily due to the rising delinquencies and defaults in its payment option arm loan portfolio, a significant portion of which was originated on a "stated income" basis. The deterioration in this portfolio has resulted in the need for greater levels of capital and allowance for loan and lease losses.

155.     The Bank Order directed the Bank to upgrade the ALLL methodology, to cease originating Option ARM loans, and to develop a business plan that moved the Bank away from offering nontraditional mortgage products.

156.     On October 20, 2008, Camner was asked to resign and retire as CEO and Chairman of the Holding Company's Board by the other members of the Holding Company's Board.

157.     On October 24, 2008, the Holding Company announced Camner's retirement as Chairman and CEO of the Holding Company, and his new role as "Chairman Emeritus."

158.     On December 16, 2008, the Holding Company filed a 2008 Form NT 10-K, announcing a delay in filing its financial statements. The Holding Company admitted "the implementation and execution of the Company's controls and procedures did not ensure the systematic and accurate execution of account level analyses related to the residential loan

- 43 -

portfolio, including the allowance for loan losses," and that its "internal control over financial reporting and disclosure controls and procedures were not effective at September 30, 2008."

159.    In a Form 8-K filed on January 27, 2009, the Holding Company announced that although its 2008 Form NT 10-K had stated that the Holding Company "expected to report a loss of approximately $327 million in the fourth fiscal quarter of 2008," the ALLL analysis at the time was incomplete, and additional review of the Holding Company's ALLL indicated that the loss for the fourth fiscal quarter of 2008 would be approximately $607 million.

160.    On February 10, 2009, the Holding Company filed a notice of late filing of Form 10-Q for the quarter ending December 31, 2008, announcing that it was unable to timely file a Form 10-Q for the quarter, and reporting "preliminary" ALLL values of $704.5 million for the quarter ending December 31, 2008 and $772.6 million for the quarter ending March 31, 2009.

161.    On April 14, 2009, the OTS issued a Prompt Corrective Action Directive ("PCA Directive") to the Bank.  The PCA Directive stated that: (1) the OTS notified the Bank on February 10, 2009 that the Bank was critically undercapitalized as of January 30, 2009; (2) the OTS had considered and denied the Bank's Capital Plan as set forth in a letter to the Bank dated April 10, 2009; and (3) the Bank must be recapitalized by (a) merging with or being acquired by another financial institution, financial holding company, or other entity, or (b) the sale of all or substantially all of the Bank's assets and liabilities to another financial institution, financial holding company, or other entity within 20 days.

- 44 -

162.     The Holding Company announced the PCA Directive in a Form 8-K filed with the SEC on April 17, 2009.

163.     On May 12, 2009, the Holding Company filed a notice of late filing of Form 10-Q for the quarter ending March 31, 2009, explaining that it was unable to file a timely Form 10-Q for the quarter because it had not completed its financial results for Fiscal Year 2008, the quarter ending December 31, 2008, and the quarter ending March 31, 2009.

164.     The Holding Company having been unsuccessful in its efforts to raise capital, on May 21, 2009, the OTS closed the Bank and appointed the FDIC as a receiver of the Bank for the purpose of liquidation or winding up the Bank's affairs, because, among other reasons, the Bank's liabilities exceeded its assets, the Bank was unable to meet its obligations to its creditors and others, and the Bank was in an unsafe and unsound condition to transact business.

165.     Also on May 21, 2009, the FDIC announced the sale of the Bank to a newly chartered federal savings bank (the "New Bank"), and that a consortium of private investors had agreed to invest $900 million in capital into the New Bank.

166.     On May 22, the Holding Company filed its petition for relief under Chapter 11 of the Bankruptcy Code.

## CLAIMS FOR RELIEF

### COUNT I
**Failure to Implement and Maintain Effective Risk Management Procedures and Internal Controls -- Breach of Duty of Care (Against Defendants Camner and Lopez)**

167.     Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

- 45 -

168.     As officers of the Holding Company, each Defendant owed fiduciary duties to the Holding Company to act in good faith, with the care an ordinarily prudent person in a like position (having the special skills and knowledge reasonably expected of a person in his position) would exercise under similar circumstances, and in a manner he reasonably believed to be in the Holding Company's best interest.

169.     These duties required each Defendant to (1) devote sustained, affirmative attention to ensuring that effective internal controls were established and maintained over financial accounting and reporting; (2) exercise vigilant oversight to ensure that effective systems, procedures, and personnel were in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis; (3) exercise vigilant oversight to ensure the implementation and maintenance of effective internal risk assessment and management functions that would enable the Holding Company and the Bank to assess and manage the risks in the Option ARM portfolio; (4) ensure that the Holding Company and its subsidiaries timely comply with regulations and directives from federal regulators; and (5) protect the Holding Company against the diminution in value of its interest in its primary subsidiary and most valuable asset—the Bank—by seeing to it that the Bank was managed properly.

170.     Defendants breached these fiduciary duties.  In so doing, Defendants' conduct was the antithesis of the good faith, care, and devotion to the best interests of the Holding Company and its constituents as required of corporate fiduciaries under applicable law.

171.     As a result of these aforesaid breaches, Defendants damaged the Holding Company in amounts to be proven at trial by causing a diminution in value of the Holding

Company's interest in its primary subsidiary and most valuable asset—the Bank—which was placed in receivership, causing the Holding Company to declare bankruptcy.

172.    Plaintiffs are entitled to judgment against Defendants, jointly and severally, for the damage thus caused to the Holding Company.

## <u>COUNT II</u>
**Failure to Provide Accurate and Complete Information
to the Holding Company's Board -- Breach of Duty of Care
(Against Defendants Camner and Lopez)**

173.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

174.    As officers of the Holding Company, each Defendant owed fiduciary duties to the Holding Company to act in good faith, with the care an ordinarily prudent person in a like position (having the special skills and knowledge reasonably expected of a person in his position) would exercise under similar circumstances, and in a manner he reasonably believed to be in the Holding Company's best interest.

175.    These duties required each Defendant to (1) provide accurate and complete information and disclosures to the Holding Company's Board regarding (a) the financial condition of the Holding Company and its subsidiaries, (b) the adequacy and effectiveness of the Holding Company's internal controls over financial accounting and reporting, (c) the adequacy and effectiveness of the systems, procedures, and personnel in place to enable the Holding Company and its subsidiaries properly to account for and accurately to report on the financial results of the Holding Company on a consolidated basis, and (d) the adequacy and effectiveness of internal risk management and assessment functions in place to enable Defendants and the Bank to assess and manage the risks in the Option ARM portfolio; and to

- 47 -

(2) not make material misrepresentations and omissions in consolidated financial statements filed with the SEC and relied upon by the Holding Company's Board.

176.     Defendants breached these fiduciary duties.  In so doing, Defendants' conduct was the antithesis of the good faith, care, and devotion to the best interests of the Holding Company and its constituents required of corporate officers under applicable law.

177.     In reliance on the inaccurate information presented to it by Defendants about the financial condition of the Holding Company—information that was inaccurate because of, *inter alia*, Defendants' failures to cause to be implemented effective internal controls over financial accounting and reporting, including timely stress testing of the Option ARM portfolio and development of a reliable ALLL methodology—the Holding Company's Board (1) authorized the expenditure of approximately $34 million by the Holding Company in 2007 to repurchase the Holding Company's Class A Common Stock at artificially inflated prices, and (2) authorized the payment of dividends on the Holding Company's stock of approximately $2,013,000.  The Holding Company was damaged by these expenditures in amounts to be proven at trial.  These damages were proximately caused by Defendants' breaches of fiduciary duty described above in this Count II.

178.     The Holding Company was damaged further by the breaches of fiduciary duty described above in this Count II because the presentation by Defendants of inaccurate information about the financial condition of the Holding Company resulted in the improvident incurrence by the Holding Company of debt in 2007, which artificially prolonged the Holding Company's existence and caused it to incur additional losses. Defendants' breaches of fiduciary duty were the proximate cause of these losses, the amounts of which are to be proven at trial.

- 48 -

179.     Plaintiffs are entitled to judgment against Defendants, jointly and severally, for the damage thus caused to the Holding Company.

## COUNT III
**Failure to Provide the Holding Company's Board With All Reasonably Available Information Relevant to Whether to Authorize the August 2008 $80 Million Capital Contribution and a Reasonable Opportunity to Consider Whether Such Capital Contribution Should Be Made -- Breach of Duties of Loyalty and Care (Against Defendant Camner)**

180.     Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth in paragraphs 130 through 148 of this complaint, as though fully set forth herein.

181.     Camner, as CEO of the Holding Company, owed a fiduciary duty to the Holding Company to discharge his duties in good faith, with the care an ordinarily prudent person in a like position (having the special skills and knowledge reasonably expected of a person in his position) would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Holding Company.

182.     In connection with the proposed $80 million capital contribution by the Holding Company to the Bank, Defendant Camner also had a fiduciary duty of loyalty to the Holding Company to provide the Holding Company's Board with all Relevant Information and a reasonable opportunity to consider whether, in light of the Relevant Information, it was in the Holding Company's best interest to infuse $80 million of cash into the Bank.

183.     Instead, as previously described in this complaint, Defendant Camner presented the Holding Company's Board with a *faít accomplí*, and the capital contribution was made without consideration of all Relevant Information and proper deliberation.

- 49 -

184.    Defendant Camner's actions in this regard were the antithesis of good faith, care, and devotion to the best interests of the Holding Company and its constituents as required of corporate fiduciaries under applicable law.    As a consequence, Defendant Camner breached his fiduciary duties of care and loyalty to the Holding Company.

185.    The aforesaid breaches of fiduciary duty were the proximate cause of injury to the Holding Company in the amount of $80 million.

186.    Plaintiffs are entitled to judgment against Defendant Camner in the amount of $80 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment in favor of Plaintiff, on behalf of the Estate, as follows:

(a)    against Defendants Camner and Lopez, jointly and severally, on Counts I and II of the Complaint, awarding damages in the amount proven at trial.

(b)    against Defendant Camner on Count III of the Complaint, awarding damages in the amount of $80 million.

Dated: _____ __, 2010

KILPATRICK STOCKTON LLP

 /s/ Todd C. Meyers
Todd C. Meyers
Georgia Bar No. 503756
Alfred S. Lurey
Georgia Bar No. 461500
Sameer K. Kapoor
Georgia Bar No. 407525
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)
tmeyers@kilpatrickstockton.com

- 50 -

and

KOZYAK TROPIN & THROCKMORTON, P.A.

Corali  Lopez-Castro, Esq.
Florida Bar No. 863830
2525 Ponce De Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800 (Telephone)
(305) 372-3508 (Facsimile)
clc@kttlaw.com

Counsel for the Official Committee of Unsecured
Creditors of BankUnited Financial
Corporation, *et al.*

- 51 -

**<u>EXHIBIT B</u>**

Page 1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     Judge Laurel Myerson Isicoff
3
4    IN RE:
                                   )
5    BANKUNITED FINANCIAL          ) CASE NO: 09-19940-BKC-LMI
     CORPORATION,                  )
6         Debtor.                  )
     _____ /
7
8
          MOTION TO ENFORCE (373), SUPPLEMENT FILED
9         BY CREDITOR (404), SUPPLEMENT FILED BY CREDITOR
          (405), MOTION TO REJECT EXECUTORY CONTRACT (375)
10
11
                     DECEMBER 28, 2009
12
13
14        The above-entitled cause came on for hearing
15   before the HONORABLE LAUREL M. ISICOFF, one of the
16   judges in the UNITED STATES BANKRUPTCY COURT, in and
17   for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51
18   SW 1st Avenue, Miami, Dade County, Florida, commencing
19   at or about 3:30 p.m., on December 28th, 2009, and the
20   following proceedings were had:
21
22
23
24             Reported by: Carmen E. De La Cruz
25

Page 2

1    APPEARANCES:

2

3    STEARNS WEAVER MILLER

4    BY: PATRICIA REDMOND, Esq., and

5        BRIAN HAWKETT, Esq. (Via telephone)

6    On behalf of New Bank

7

8    JEFF REICH, Esq.

9    On behalf of FDIC (via telephone)

10

11   GREENBURG TRAURIG

12   BY: MARK BLOOM, Esq., and

13       JOHN DODD, Esq.

14   On behalf of the Debtors.

15

16   KILPATRICK STOCKTON

17   BY: TODD MEYERS, Esq., and

18   KOZYAK TROPIN & THROCKMORTIN

19   BY: DAVID SAMOLE, Esq.

20   On behalf of the Committee

21

22

23

24

25

1              THE COURT:  Good afternoon everybody.  I'm

2    calling the matter of BankUnited.  I'll take

3    appearances starting with those on the phone.  Going

4    once, going twice.  I tell you what, I know it says

5    listen only, but I'm going to take attendance.

6    Mr. Hawkett, are you on the line?

7              MR. HAWKETT:  Yes, I am, Your Honor.

8    Brian Hawkett on behalf of new BankUnited.

9              THE COURT:  Okay.  Mr. Reich, are you on

10   the line?

11             MR. REICH:  Yes, I am, Your Honor.  Jeff

12   Reich for the FDIC.

13             THE COURT:  Okay.  Sorry, I mispronounced

14   your name.

15             MR. REICH:  That's okay.

16             THE COURT:  Mr. Zloto, are you on the

17   line?  Mr. Zloto?  Z-L-O-T-O.

18             MR. ZLOTO:  Yes, I am.

19             THE COURT:  Okay.  And you're on your own

20   behalf, sir?

21             MR. ZLOTO:  Yes, I am.

22             THE COURT:  All right.  Then I'll take

23   appearances from the courtroom starting with the

24   debtor.

25             MR. BLOOM:  Good afternoon, Your Honor.

1   Mark Bloom and John Dodd of Greenburg Traurig on

2   behalf of the debtor's BankUnited Financial

3   Corporation and its two subsidiaries.  Also present is

4   the chief restructuring officer, Joseph Luzinski.

5                THE COURT:  All right.  Good afternoon

6   everybody.

7                MR. MEYERS:  Good afternoon, Your Honor.

8   Todd Meyers Kilpatrick Stackton on behalf of the

9   committee, also David Samole from Kozyack Tropin &

10  Throckmortin for the committee.

11               THE COURT:  Okay.  Good afternoon.

12               MR. BERMAN:  Good afternoon, Your Honor.

13  For the FDIC, Bruce Berman also of McDermott Will &

14  Emery, and we have from Yede Seperate & Reid, Dennis

15  Kline and Eveva Warnick.

16               THE COURT:  Okay.  Good afternoon

17  everybody.

18               MS. REDMOND:  Good afternoon, Your Honor.

19  Patricia Redmond, Stearns Weaver, local counsel with

20  Mr. Hawkett for New Bank.

21               THE COURT:  Good afternoon.

22               MR. ECKHARDT:  Your Honor, Kevin Eckhardt

23  of Hunton & Williams on behalf of US Bank as

24  endentured trustee.

25               THE COURT:  Okay.  All right.  Mr. Bloom,

1    I know we have the committee and the FDIC motion, but

2    I know we also have two motions to reject executory

3    contracts, did you want to take care of those first?

4            MR. BLOOM:  If we could, Your Honor.

5    Mr. Dodd would the Court to entertain his treatment of

6    the executory contract motions.

7            THE COURT:  Okay.  Mr. Dodd, proceed.

8            MR. DODD:  Good afternoon, Your Honor.  We

9    are here on the debtors two motions to reject

10   executory contracts.  The first contract is between

11   the debtors and Kurtzman Carson Consultants Inc., and

12   the second is between the debtor and Intralinks, Inc.

13           As reflected on the docket, certificates

14   of service were filed, both as to our original motion

15   and the Court's motion rescheduling this matter from

16   tomorrow to today, proper service was had on

17   Interlinks and Kurtzman Carson.

18           THE COURT:  Well, let's start with

19   Kurtzman Carson because they have an agreement as I

20   understand; correct?

21           MR. DODD:  That's correct, Your Honor.

22           THE COURT:  That agreement would be to --

23   remind me, they're keeping some money or what -- how

24   is that working?

25           MR. DODD:  They took a $30,000

1  pre-petition retainer and there was also $3,000 in

2  pre-petition services.  So we have agreed to set off

3  the $3,000 against the retainer, and they've agreed to

4  return the $27,000 remaining in the retainer.

5          THE COURT:  Okay.  Does anybody have an

6  objection to getting money back?  It's funny how that

7  works.

8          All right.  Now, you say you gave notice

9  to everyone and obviously no one's here from Kurtzman

10  Carson.  I've reviewed the motion, it certainly seems

11  since, correct me if I'm wrong, as I recall this was a

12  professional that was retained prior to the board

13  switching over; is that correct?

14          MR. DODD:  Correct.  It was retained by

15  the prior board and prior management.

16          THE COURT:  Okay.  Is there any objection

17  by any party to the relief sought in Docket Entry 374?

18  All right.  Then I'll go ahead and I'll grant Docket

19  Entry 374, allow rejection and the return of the

20  27,000 with the payment of 3,000 or the retention of

21  the 3,000.  Okay?

22          MR. DODD:  Thank you.

23          THE COURT:  All right.  So, now let's turn

24  to Intralinks.

25          MR. DODD:  Intralinks.  They provide

Page 7

1    virtual data rem services.

2              THE COURT:  Uh-huh.

3              MR. DODD:  There's no objection filed on

4    the docket, however they contacted us today.

5              THE COURT:  Intralinks did?

6              MR. DODD:  Intralinks.

7              THE COURT:  Uh-huh.

8              MR. DODD:  Or their counsel, their

9    in-house counsel did.  And although they no longer

10   have an objection, they've asked that we explicitly

11   provide in the order -- backing up a step.  They

12   believe they have an administrative expense claim

13   against the estate for, as I've said, services that

14   were rendered post-petition.  Apparently, not the

15   debtors but some non-debtors used the site after the

16   petition date.  So, they've asked that we put in the

17   order, reserving that nothing in the order impairs

18   their right to seek administrative expense.  And that

19   the deadline to seek that administrative expense is

20   the same as the general administrative claims bar date

21   once one is set.

22              THE COURT:  Okay.  All right.  Does anyone

23   have an objection to the motion to reject executory

24   contract with the agreed upon language being included

25   in the order?  All right.  Hearing no objection, I

1   will grant that motion.  I want to go back -- that's

2   Docket Entry 374, of course in 375 you'll also include

3   the rejection language that gives them 30 days to file

4   a rejection claim.

5            MR. DODD:  Yes, Your Honor.

6            THE COURT:  So now I want to go back to

7   Docket Entry 374 just to make something clear.

8   Kurtzman is returning 27,000 of the 30,000.  Have they

9   agreed to waive a rejection claim, is that a fair

10  assumption or not?

11           MR. DODD:  I would not say it's a fair

12  assumption.  I don't know if they've agreed to waive

13  their rejection claim.

14           THE COURT:  Okay.  Then make sure that

15  that language appears in that order as well.  Okay,

16  Mr. Dodd?

17           MR. DODD:  I will.

18           THE COURT:  All right.  So those two

19  motions are granted.  Thank you.  All right.  Then

20  we'll go on, do I have anything else then from the

21  debtor today?  No?

22           MR. BLOOM:  No, Your Honor.

23           THE COURT:  Okay.  Then we'll go on to the

24  motion to enforce.  Who will be arguing, Mr. Berman or

25  Mr. Klein?

Page 9

1          MR. BERMAN:  I will be.

2          THE COURT:  Okay.  All right.  Mr. Berman,

3    I will tell you that as you approach the lectern, in

4    that long walk of three steps, that I have reviewed

5    the motion.  Let me get my notebook so I make sure I'm

6    clear in what I've reviewed.  All right.  Let's see,

7    I've reviewed your motion to enforce, Docket Entry

8    737.  I have reviewed the supplemental statement,

9    Docket Entry 404.  I've reviewed the supplemental

10   authority, Docket Entry 405.  I've reviewed the

11   debtor's response, Docket Entry 406.  I've reviewed

12   the committee's response or objection rather, that's

13   Docket Entry 409, and I also reviewed Docket Entry

14   371, which was the response of the committee to the

15   reservation of rights filed by the FDIC.  In addition

16   to lots of case law.

17          So is there anything that you believe I

18   should have looked at in advance of today's hearing

19   that I have not reviewed?

20          MR. BERMAN:  Two things, first Docket

21   Entry 412 which we filed this morning.  I don't know

22   if Your Honor had a chance to see that or not.  It

23   was --

24          THE COURT:  Did anybody call my chambers

25   to say that something was filed at the last minute?

1            MR. BERMAN:  I don't know that they did.

2    This was in response to the debtor's filing which was

3    just the day before Christmas Eve.  So we --

4            THE COURT:  Okay.  Well, if you don't call

5    me, then I don't know about it, because remember the

6    bat light doesn't go on on the computer.  So I did not

7    review it.  And so why don't you tell me briefly what

8    your document says?

9            MR. BERMAN:  Your Honor, I think -- well,

10   first of all the documents you said that you had

11   reviewed including 405, the FDIC supplemental

12   authority, I just wanted to clarify that this -- we're

13   here today on a preliminary hearing.

14           THE COURT:  Uh-huh.

15           MR. BERMAN:  This all came about, and we

16   tried to summarize this in this morning's filing which

17   was really just intended to say that the preliminary

18   question and the reason that we're here all had to do

19   with Your Honor's concern about an advisory opinion.

20           THE COURT:  Uh-huh.

21           MR. BERMAN:  We had -- you had asked us

22   and this was in November, last month at the November

23   24th hearing when you had raised a concern, you had

24   asked us to check with the committee and see if we

25   could agree that this was or was not a problem.  We

1    checked with the committee, they in turn felt it was

2    important to check with the debtor, the debtor's

3    counsel, which they did, and we reflected that the --

4    that neither of them would agree that there was no

5    advisory opinion issued.  And as a result of that, we

6    went ahead and prepared and filed our supplemental

7    statement, which was Docket Entry 404 --

8                THE COURT:  Uh-huh.

9                MR. BERMAN:  -- to address the advisory

10    opinion issue.

11                THE COURT:  Right.

12                MR. BERMAN:  The -- when we received the

13    debtors and committee's responses, the debtors

14    response said only, we hope there's going to be no

15    adjudication as to the claims that we're handling

16    directly and in our reply we point out that we had

17    never addressed those and they had no reason for

18    concern as far as we were concerned.  And the

19    committee's response they raised no issue with respect

20    to the ripeness or advisory opinion issue.  So we were

21    somewhat baffled that we had to come here at all today

22    because that was the only issue that was tee'd up and

23    the only reason for having this hearing.

24                When you had said earlier that you had

25    looked at Docket Entry 405, the supplemental

1    authority, that -- that was just to bring to the

2    attention of the Court those decisions in the Northern

3    District of Georgia, which had to do with the merits

4    of the claim.

5              THE COURT:  Uh-huh.

6              MR. BERMAN:  Which Your Honor had

7    indicated at the November hearing was something you

8    felt might take an hour to an hour and a half to hear

9    and which we're not on today, because your feeling was

10   if we had to address this preliminary potential

11   hurdle, that we should make sure we get that out of

12   the way.

13             So in essence, what we said in this

14   morning's filing was simply that we came here for what

15   appeared to be a dispute which we don't appear to have

16   and didn't seem to us at all, we really need to do

17   today is to set the briefing schedule and a time for a

18   hearing on the merits.

19             THE COURT:  Well, I would hate to think

20   that Mr. Kline and Ms. Warnick flew down here just

21   for a briefing schedule.

22             MR. BERMAN: But Ms. Warnick is here and

23   Mr. Kline's office is in --

24             THE COURT:  And it's a lot colder in

25   Washington, D.C. than it is here.

1          MR. BERMAN:  And there's a lot less snow

2    here.

3          THE COURT:  Okay.  Well, maybe I misread

4    the creditors committee response and Mr. Meyers can

5    address this, but I thought that what the committee

6    said in its response was that we think, we the

7    committee, that we have to file a complaint seeking

8    determination of this issue with the FDIC.

9          MR. BERMAN:  The way we read and

10   understood it was is they talked about the

11   appropriateness of the procedural vehicle.

12         THE COURT:  Okay.

13         MR. BERMAN:  Which was really not the

14   issue that we came on.  We came as to whether the

15   Court could determine an issue of ownership of these

16   claims in this context, which is a context of the

17   notices that were provided by the committee on the

18   insurance claims.

19         THE COURT:  Right.

20         MR. BERMAN:  Those and our assertion which

21   we'd argue on the merits when we get to them is that

22   those -- but for ripeness purposes, those notices are

23   sufficiently specific to identify claims that arise

24   out of injuries to the bank and those feed directly

25   into the decisions which you put before the Court.

```
 1            THE COURT:  Uh-huh.
 2            MR. BERMAN:  So -- and the ripeness issue
 3  as opposed to the procedural vehicle issue I think is
 4  clearly distinguishable, it's the one that we thought
 5  was the concern for Your Honor to set up this initial
 6  obstacle --
 7            THE COURT:  Uh-huh.
 8            MR. BERMAN:  -- and it just appears to us
 9  that, I'm not sure how this situation could have come
10  to pass, I don't understand --
11            THE COURT:  I guess because nobody read
12  Elario versus Miller, or cited it to me or nobody read
13  the Sunrise Securities case.  Maybe that's why we're
14  here today.
15            So, Mr. Meyers, I'm going to ask Mr.
16  Berman to sit down for a minute, and you tell me what
17  your response says.  Because I read your response to
18  say that you were going to file a dec action to
19  determine whether you have the right to bring these
20  claims.
21            MR. MEYERS:  You read our response
22  correctly, Your Honor.
23            THE COURT:  Okay.
24            MR. MEYERS:  Your Honor, back -- when we
25  were back last here it was brought to Your Honor's
```

1   attention that the FDIC had filed a motion and in that

2   motion, as they stated, there's an issue of ownership.

3   Who owns the claims that the committee has asserted in

4   their demand letter.

5                    THE COURT:  Uh-huh.

6                    MR. MEYERS:  Does the estate own them or

7   does the FDIC own them?  And Your Honor properly

8   raised the question in the context of hearing that

9   there was this ownership issue which is, is that right

10  for me to determine now or only after they file a

11  lawsuit on those claims.  Okay.  And so you sent the

12  parties back.  Well, what the parties did -- or at

13  least what the committee is we went and read the

14  motion.

15                    THE COURT:  Uh-huh.

16                    MR. MEYERS:  And what we realized in

17  reading the motion and which was even more

18  crystallized when they filed their supplement the

19  other day, is that while the FDIC does seek a

20  determination of ownership and the committee

21  desperately would like a determination of ownership,

22  the context that this has been brought is a motion to

23  enforce the derivative standing order --

24                    THE COURT:  Uh-huh.

25                    MR. MEYERS:  -- and the FDIC in their

1   supplemental papers has argued, and in their original

2   papers, argues the committee violated that order.

3   Well, before you get to the ownership issue, and

4   before you even get to the advisory opinion issue.  In

5   other words, whether the Court can determine ownership

6   now or later when there's an actual suit brought,

7   before you get to either of those issues, you get to a

8   different issue which is, did -- even if you assume

9   it's not advisory and even if you assume the committee

10  does not own the claims it asserted, did the committee

11  violate the order.

12          For if the committee didn't violate the

13  order, irrespective of the ownership of these

14  claims --

15          THE COURT:  Uh-huh.

16          MR. MEYERS:  -- then the motion's going to

17  be denied.  And while the FDIC talks about efficiency

18  and expediting a ruling, the last thing the committee

19  wants to do is argue this in a context which is not

20  procedurally appropriate and may not stand up on

21  appeal.  For what if Your Honor says, well, okay.  I'm

22  going to ignore the fact that I don't think the

23  committee could possibly have violated the order

24  irrespective of ownership and I'm going to go ahead

25  and rule on the context of this motion and determine

Page 17

1   ownership, and what if Your Honor rules in favor of

2   the committee.  Well, and then the FDIC appeals an

3   Appellate Court might just throw it back and say,

4   well, that was a dicta.  The Court didn't need to

5   reach that issue.  They filed a motion for the Court

6   to enforce her order.  Well, there was nothing to

7   enforce.  The committee had never violated anything.

8           Your Honor said in the transcript of the

9   hearing that lead to the --

10          THE COURT:  Which hearing, the September

11  15th hearing?

12          MR. MEYERS:  Yes.

13          THE COURT:  Okay.

14          MR. MEYERS:  That the committee should,

15  within the confines of Rule 11, assert the claim --

16  investigate and then assert the claims that it

17  believes it owns.  Well, rest assured, not only do we

18  believe we own the claims we've asserted in the demand

19  letter, but we're convinced that legally we own those

20  claims.  But even if you find, you know -- even if you

21  find that we don't --

22          THE COURT:  Uh-huh.

23          MR. MEYERS:  -- on certain of the claims

24  or all of the claims, we certainly had a good faith

25  basis and have cited Your Honor already to law which

Page 18

```
 1   supports the position that we own every claim that we
 2   asserted.  So we could not possibly have violated the
 3   order, and therefore, we think the motion -- there's
 4   nothing for the Court to do right now, but simply deny
 5   the motion.
 6               THE COURT:  Deny the motion to enforce?
 7               MR. MEYERS:  Deny the motion to enforce.
 8               THE COURT:  Uh-huh.
 9               MR. MEYERS:  Now, that would leave us back
10   to where we were, but you have --
11               THE COURT:  Starting all over again.
12               MR. MEYERS:  Starting all over.  But
13   again, we didn't pick this procedure, the FDIC did.
14   The -- while we could wait to file a complaint, a suit
15   on the claim, let them move to intervene and then move
16   to dismiss.  Frankly, given all the -- all the chaos
17   and all the noise that the FDIC has created in this
18   case about their ownership issue -- about the
19   ownership issue, we would just assume get a
20   determination and get it quickly.
21               THE COURT:  Well, then let me ask you a
22   question, putting aside your observations regarding
23   the motion to enforce and I'll ask Mr. Berman, who I
24   think, Mr. Berman, you're the one that traveled down;
25   right?
```

Page 19

```
 1                MR. BERMAN:  No, I'm here.

 2                THE COURT:  Oh, you're here.  Okay.  I

 3    know somebody else that travels.

 4                MR. REICH:  Your Honor, it's Mr. Reich.

 5    I'm the one who travels.

 6                THE COURT:  Oh. Okay.

 7                MR. REICH:  I travel, and I'm on the phone

 8    today.

 9                THE COURT:  Okay.  The -- what is the

10    difference between resolving it through a motion and

11    resolving it through an adversary proceeding?  Either

12    it's an advisory opinion or it's not.

13                MR. MEYERS:  Well, but it's a different --

14    but that's a different question.  I still believe we

15    have to address the issue of whether in an adversary

16    it would be an advisory opinion and I'm prepared to

17    address that.

18                THE COURT:  Well, but --

19                MR. MEYERS:  But what I'm saying is that

20    their motion stands to be denied.  They've asked you a

21    question which is to determine that we've violated an

22    order.  We could not possibly have violated the order

23    no matter whether it's advisory or not, whether we own

24    them or not.  And so the motion stands to be denied.

25                Now, in an adversary proceeding,  if we
```

Page 20

```
1   were to file an adversary proceeding under Rule 7001 a
2   dec action seeking the determination of whether --
3               THE COURT:  Seeking a determination of
4   what?
5               MR. MEYERS:  Of whether the committee owns
6   -- well, the estate -- I'm sorry.  Seeking a
7   determination of whether the estate owns the claims
8   that were set forth in the demand letter.  Okay.  Now,
9   you might ask, well, is that an advisory opinion.  And
10  that's a fair question.  We don't think it is.  We
11  think that the estate, whether through the debtor or a
12  committee, whoever is charged with that, has the
13  ability to determine under 7012 and 7019, whether a
14  certain asset belongs to the estate.
15              Now, granted, normally you're asking
16  whether the estate owns the car or owns the piece of
17  real estate.  Here we're asking whether it owns
18  certain claims and, in fact, that we haven't sued on
19  these claims yet, buy --
20              THE COURT:  That's right.
21              MR. MEYERS:  -- but we believe that --
22  frankly, I mean, if the Court finds that it's advisory
23  then we'll have to wait until a later day, but we
24  think if we were to tee up that adversary it would be
25  appropriate for the Court to decide whether those
```

1  claims are owned by the estate so that the estate

2  knows whether or not they should be spending --

3  continuing to spend time and effort pursuing those

4  claims.

5           THE COURT:  Okay.  So you're saying that

6  rather than just going to a complaint and filing a

7  complaint that articulates exactly what it is you're

8  seeking, that we should take this first step and

9  that's more economical?

10          MR. MEYERS:  Well, economics are

11  important, but it's but one consideration.  I don't

12  know that we are -- we can tee up right now.  We can

13  tee up an adversary to determine ownership of those

14  claims.  I don't think that the committee is yet

15  finished with the investigation such that they would

16  actually file the complaint.  It could be a month from

17  now, it could be six months from now, I'm not quite

18  sure, but we are still reviewing -- we're getting

19  documents rolling in from the FDIC.  We just recently

20  obtained documents from the Kammer Upchitz firm which

21  are being reviewed.  So, there's a process there that

22  we're still looking at before we would actually file a

23  complaint.  Okay?  That's both to put additional meat

24  on the bones of what we've already asserted, possibly

25  to expand on things, possibly to assert additional

 1   claims.

 2           Now, there was an insurance deadline for

 3   lack of a better term and because of that we did as

 4   quick and as thorough an investigation as we could

 5   before that deadline and we couched our claims both

 6   specifically, but also broadly.  And we think that

 7   under the relation back provisions of any insurance

 8   policy, whatever we assert, we think will be covered

 9   but, frankly, you know, there are individuals who

10   hopefully have assets and even if insurance doesn't

11   cover something, that may not of been asserted in a

12   demand letter.  If we uncover something, and we think

13   we were pretty thorough already, but we've got more

14   documents to review, then we would assert that.  But

15   we think that the -- certainly the bulk, if not the

16   entirety, then the bulk of the types of claims we're

17   asserting are articulated in those letters and that's

18   enough for the Court to decide whether or not the

19   estate owns those claims and therefore should spend,

20   you know, further effort pursuing them by filing a

21   complaint.

22           THE COURT:  Uh-huh.

23           MR. MEYERS:  That's our belief.

24           THE COURT:  Okay.

25           MR. MEYERS:  But in the current context,

Page 23

```
 1   it's -- as we said in our papers, it's tempting and as
 2   we told the FDIC, we'd love nothing more than to get a
 3   determination and get it sooner rather than later.
 4                 THE COURT:  Bring it on.
 5                 MR. MEYERS:  But we just can't do it in
 6   the context of a pleading citing contempt cases and
 7   saying that we violated an order, because we did no
 8   such thing.
 9                 THE COURT:  Okay.
10                 MR. MEYERS:  And that should be apparent.
11                 THE COURT:  All right.
12                 MR. MEYERS:  Thank you, Your Honor.
13                 THE COURT:  Thank you.  All right.
14                 MR. REICH:  Your Honor, this is Jeff
15   Reich.  When it's appropriate, Your Honor, I'd like an
16   opportunity to respond to Mr. Meyers?
17                 THE COURT:  Well, I'm assuming that
18   Mr. Berman will do that, or you would rather step in
19   now?
20                 MR. REICH:  I can defer to Mr. Berman if
21   he'd rather.
22                 THE COURT:  Well, I don't normally allow
23   two lawyers to argue for the same client.
24                 MR. REICH:  That's fine, Your Honor.  I'll
25   let Mr. Berman respond.
```

1          THE COURT:  I think Mr. Berman's doing

2     okay so far.  Okay.  Mr. Bloom, before I hear from

3     Mr. Berman again, is there anything that you would

4     like to add on behalf of the debtor?

5          MR. BLOOM:  Only this, Your Honor, first

6     we think that the premise of the FDIC's reply filed

7     this morning that Mr. Berman may arise to the court

8     with is incorrect in suggesting that the three parties

9     could get together and agree that the motion to

10    enforce raises an issue on which it does not seek an

11    advisory opinion and the debtor is not party -- the

12    debtor's are not party to any such agreement.  It is

13    of course the province of this Court to determine

14    matters of it's own subject matter jurisdiction

15    irrespective of any agreement on the part of the

16    parties to attempt to convert jurisdiction upon it and

17    we will accept whatever ruling your Court makes with

18    respect to the issue of whether the substantive issues

19    raised in the FDIC's motion seek an advisory opinion

20    or a ripe for adjudication.

21          Secondly, having made no such concession,

22    I will only point out exactly what we attempted to do

23    in our very brief preliminary response.  I believe the

24    FDIC is acknowledged and limited itself to that now.

25    All that we are seeking in light of the fact that the

1  derivative standing order reflects our stated

2  intention to stand down on the issues that were seated

3  over to the committee --

4            THE COURT:  Uh-huh.

5            MR. BLOOM:   -- to file derivatively on

6  behalf of the estate, all that we are seeking is the

7  determination that whatever the outcome here is going

8  to be limited to the controversy surrounding the

9  notice letter sent by the committee and will have

10 nothing to do with any other yet unidentified claims

11 against other defendants that the estates may have

12 retained.  The FDIC appears to embrace that in their

13 reply that they filed this morning where they indicate

14 that they're not seeking -- I believe they say the

15 motion to enforce does not seek a ruling on the

16 respective ownership of any claims other than those

17 asserted by the committee in the committee notices.

18            So with that reservation, the debtor has

19 nothing further to say at this time.  We would reserve

20 the right to join on the substantive issue if the

21 Court ever gets to that.

22            THE COURT:  Okay.  Thank you.  All right.

23 Mr. Eckhardt, did you have anything you wanted to add?

24            MR. ECKHARDT:  No, Your Honor.

25            THE COURT:  No.  All right.  Mr. Hawkett?

1  Mr. Hawkett?

2          MR. HAWKETT:  No, Your Honor.  Nothing.

3  No comments from New Bank.  Thank you.

4          THE COURT:  Okay.  So, Mr. Berman, tell me

5  your motion is styled as a motion to enforce my

6  derivative standing order, and so, what is it exactly

7  that you're seeking for me to do?

8          MR. BERMAN:  We're not really seeking

9  contempt or to challenge the good faith of the

10  committee, historically or anything of that nature.

11  We -- your derivative standing order said that the

12  committee was granted standing to investigate and if

13  warranted --

14          THE COURT:  Uh-huh.

15          MR. BERMAN:  -- to pursue certain claims.

16  And the language was that are property of the debtors

17  estate.

18          THE COURT:  Uh-huh.

19          MR. BERMAN:  We now find ourselves in the

20  situation where they are asserting claims which we

21  believe on their face under that precedent if Your

22  Honor agrees, you know, with holdings of those

23  courts --

24          THE COURT:  Uh-huh.

25          MR. BERMAN:  -- our claims that belong to

1    the FDIC.  And so, to enforce the order which grants

2    in that standing only to pursue estate claims if

3    warranted that to the extent that Your Honor decides

4    that the claims they are pursuing are not those

5    claims, then they are not authorized under Your

6    Honor's order and they are now going to proceed

7    forward without the authorization, but purporting to

8    be under that order.  And so, all we're asking is for

9    the Court to rule that they cannot, in effect, we're

10   asking you to interpret your own order which is

11   something that from a ripeness standpoint is

12   authorized by the cases that we've sited in our --

13            THE COURT:  But wouldn't my order merely

14   say, don't pursue causes of action that you can't

15   pursue?

16            MR. BERMAN:  It could -- it would say --

17            THE COURT:  It's somewhat amorphus, isn't

18   it?

19            MR. BERMAN:  Well, no, because the causes

20   of action which they are pursuing are as identified in

21   their claims notices are very specific.  And so Your

22   Honor would say, these specific claims that you've

23   identified in these notices are claims that do not

24   belong to the estate.  Therefore, my order is not

25   warranted for you to pursue these under the order, and

Page 28

```
 1  you may not do so.
 2            THE COURT:  Okay.  So your position is
 3  that there's no universe of facts that could ever
 4  exist, no world, in which a bank holding company or a
 5  parent corporation could pursue it's own directors
 6  for, I'm trying to find the quote because it's 12 and
 7  13 are the most problematic; correct?
 8            MR. BERMAN:  Yes.
 9            THE COURT:  Okay.  So let me try to --
10            MR. BERMAN:  I can give you --
11            THE COURT:  I know you gave me about 47
12  copies of the notice.  Let me find it.
13            MR. BERMAN:  But I can refer you to a
14  docket number.
15            THE COURT:  Okay.  What is the docket
16  number?
17            MR. BERMAN:  373-3.
18            THE COURT:  All right.  373-3.  Let me
19  see.  Okay.  I don't know if I printed out the order
20  -- the exhibits.  All right.  373-3.  Okay.
21            MR. BERMAN:  That's Exhibit C.
22            THE COURT:  Okay.  Exhibit 3.  Yes?
23  Exhibit 3.  That's your notice.
24            MR. BERMAN:  That's Exhibit C of -- this
25  is our filing.
```

1          THE COURT:  All right.  But I'm looking

2    -- no, no.  The committee notice.

3          MR. BERMAN:  No, the one you see is a

4    Kilpatrick Stockton one.

5          THE COURT:  Okay.  That's Exhibit 4.

6          MR. BERMAN:  It's Document Number 373-3,

7    and it's Exhibit C to this motion.

8          THE COURT:  Okay.  All right.  So 12 and

9    13.  The failure as chief executive order of

10   BankUnited Financial Corp.

11          MR. BERMAN:  You'll see it's the reference

12   in the second line to cause or acquiescing in unsafe

13   and unsound lending practices.  And in Paragraph 13 in

14   the second line at the end you'll see, to correct the

15   bank's unsafe and unsound practices.  These are --

16   these could not be clearer claims based on banking

17   practices.

18          THE COURT:  Okay.  So in your universe a

19   bank holding company could never sue it's own officers

20   and directors for losses that may have been caused to

21   those shareholders by virtue of obligations that that

22   holding company director had to it's own shareholders

23   under Florida Corporate law?

24          MR. BERMAN:  That -- that's correct.

25   Under those cases that we rely upon, because the

1   injury and the acts have to be distinct from those of

2   others who are harmed by the same unsound banking

3   practices, those cases and the language of those

4   cases, which I can point you to, I think are very,

5   very clear to that extent.

6           And it's that really which is the hook

7   that enables you to make a determination now which we

8   think could save the estate a tremendous amount of

9   money.

10          THE COURT:  But how can I know without

11  seeing a complaint and seeing how that is couched to

12  make an absolute determination of that issue?

13          MR. BERMAN:  On these particular ones, I

14  think you can make that absolute determination from

15  these.  There's no -- I don't think we can assume that

16  a complaint would have so much specificity that you

17  would have anymore significant direction than this.

18  It may -- our belief, frankly, is because -- we point

19  you to 12 and 13, because we think the language is so

20  specific there.

21          THE COURT:  Uh-huh.

22          MR. BERMAN:  The fact that they would

23  assert a claim which they characterize --

24          THE COURT:  They, meaning the committee?

25          MR. BERMAN:  They, the committee.

1        THE COURT:  Uh-huh.

2        MR. BERMAN:  -- which they characterize in

3   the beginning by saying the committee has concluded

4   that the estate has claims for damage against you for

5   wrongful acts or omissions, this is not an equivocal

6   statement.

7        THE COURT:  Uh-huh.

8        MR. BERMAN:  So they identified the

9   specific claims that they have that they have

10  concluded exist, and they identified them in terms of

11  rights that they claim spring from unsafe and unsound

12  lending practices.  And our position is that that's

13  not conceivably possibly an estate owned claim.

14       There are other paragraphs in here which

15  are very vague, and it's difficult to determine from

16  those.  I don't know that with nothing more than

17  those, you could make a determination as to those.  It

18  -- I don't know what's going to happen at the hearing

19  on the merits.  It may be that Mr. Meyers will tell us

20  for the first time that those are based on banking

21  practices and then we'll know.  It may be that he'll

22  take the position similar to the one that he's taken

23  at prior hearings where he's said, I'm not going to

24  let you know.  I don't want to at this time, and I

25  don't have to.  If that's so, then we may not be able

1   to determine the entirety of the claims set that they

2   propose to bring.  But we can certainly determine a --

3   what appears to be a very significant part of it, and

4   those just seem to us plainly outside of the sliver

5   recognized in the cases.

6               THE COURT:  Well, but if you recall the

7   sliver in Southeast Banking was with respect to

8   complaint that Judge Aronovitz was looking at that

9   particular time, and to judge -- and it is true, is it

10  not, that Judge Aronovitz in his references to General

11  Rubber recognized that the trustee might have direct

12  claims other than those that have been brought in the

13  complaint that he was reviewing at that time, and

14  Judge Aronovitz, in fact, gave the trustee leave to

15  amend the complaint to add those direct claims.

16              MR. BERMAN:  And Your Honor, we -- we're

17  not suggesting that there's no possibility that

18  somewhere in these vaguely stated claims, there might

19  not be a proper one and we're not saying that they

20  have to be shut down in their entirety.  It probably

21  depends a lot on what Mr. Meyers decides what he wants

22  to disclose in connection with the merits hearing.

23              THE COURT:  It may depend a lot on what

24  the ultimate complaint against the directors and

25  officers look like.

1           MR. BERMAN:  That's true too, except

2  having the benefit of this insurance notice gives us

3  very substantial and specific and formalized -- I

4  mean, yes, in those contexts the claims were

5  formalized in a complaint.

6           THE COURT:  Uh-huh.

7           MR. BERMAN:  But here the claims are

8  formulated -- are formalized in a different document,

9  but no less formalized.  It's -- I don't know if we

10 can presuppose what either Judge Aronovitz or the

11 Court in the Northern District of Georgia cases, which

12 were also based upon complaints.

13          THE COURT:  Uh-huh.

14          MR. BERMAN:  Whether if any of those

15 judges would've felt differently had the formalized

16 statement of those claims been in a different medium

17 than in a complaint.

18          THE COURT:  Well, let me ask you something

19 as the creditor of this estate because you've stated

20 that FDIC is, in fact, a creditor of this estate the

21 largest creditor.  Would you not want your committee

22 to be over inclusive in its insurance letter so that

23 there is no chance that they left something out that

24 fell through the cracks so that the insurance company

25 could later say in a well pled complaint, well, you

1    didn't put that in the letter?

2              MR. BERMAN:  Well, but the complaints,

3    Your Honor, can -- are generally tend to be theory

4    issues.

5              THE COURT:  Well, not since Ashcroft --

6              MR. BERMAN:  No.

7              THE COURT:  -- and Twombly.

8              MR. BERMAN:  Fair enough.  But the --

9              THE COURT:  No more theories there, are

10   there?

11             MR. BERMAN:  That's certainly true.  But

12   the -- in a situation -- first of all, of course the

13   FDIC has duties as receiver by statute.  So --

14             THE COURT:  Clearly.

15             MR. BERMAN:  So it is -- so FDIC is

16   responsible to protect the interest of the decision of

17   those claims in its capacity as receiver and to the

18   extent that there's conflict with that, that duty is

19   really what is moving it here.

20             THE COURT:  Uh-huh.

21             MR. BERMAN:  But to -- this isn't a

22   situation where somebody can amend themselves out of a

23   -- I don't think, I mean, they may find another kind

24   of claim to assert, but any claim that's based on

25   unsafe and unsound lending practices, unless you have

1  a different claim, I don't see a way to amend your way

2  out of that.  And I really don't see a -- I think what

3  we're really talking about is still something we'd

4  normally be talking about in the merits hearing

5  because I still think that goes to whether or not

6  we've properly presented a basis to prevail in this

7  motion.

8              THE COURT:  But --

9              MR. BERMAN:  As opposed to ripeness.

10             THE COURT:   Right.

11             MR. BERMAN:  I mean, I think that ripeness

12  which I still have heard no context for, is really a

13  dead issue now here and we have also submitted case

14  law to Your Honor that I think supports the ripeness

15  of this particular inquiry.

16             THE COURT:  Well, let me ask you something

17  and I eluded to before is that nobody cited Elario

18  versus Miller.  Nobody cited the Sunrise Securities

19  case regarding the ripeness issue.  And those cases

20  specifically hold that you cannot make a determination

21  under Florida law whether it is a direct or derivative

22  lawsuit without looking at the complaint.

23             So my question to you is, do you disagree

24  and is this a federal law issue that means I can

25  ignore the Third Circuit, and I can ignore, of course,

1   it was only the Florida Second District Court of

2   Appeal, but it was important enough to the Third

3   Circuit to rely on that case.

4           MR. BERMAN:  I think -- I can't really

5   tell, Your Honor.  I think I -- if your concern was

6   specifically related to those two holdings, I'd

7   probably want an opportunity to address them to you

8   specifically.

9           THE COURT:  Well, my question is, is the

10  Sunrise litigation case, the Brant case that you cite

11  very specifically, and many other cases say that this

12  issue of derivative versus direct is a state law

13  issue.

14          MR. BERMAN:  We agree with that.

15          THE COURT:  Okay.  So my question is, if I

16  have a Third Circuit case that relies on Florida law

17  and a Florida law case on which the Third Circuit

18  relies that specifically says that that answer can

19  only be derived from reviewing the complaint, is it

20  your position that I do not look at state law to

21  determine that issue or do I, in fact, recognize that

22  yes, it's a state law issue including that the state

23  law says I have to look at the complaint when it's

24  filed.

25          MR. BERMAN:  Well, Your Honor, I would

1   have -- what's stopping me is that -- is the context,

2   because to me this is a procedural -- a very narrow

3   procedural rather than a substantive issue.

4              THE COURT:  But this is a procedural --

5              MR. BERMAN:  Understood.  These notices,

6   these formalized notices have, we believe, the same

7   character as the complaint.  I don't know in the

8   procedural context of the other cases whether the

9   Third Circuit would have decided with this form of

10  claim in front of it.

11             THE COURT:  Uh-huh.

12             MR. BERMAN:  That this would not have

13  satisfied that requirement.  I just can't tell you

14  that.  But I have a very strong suspicion that that

15  might be the case.  I personally think it ought to be

16  the case because we have a situation -- the bottom

17  line of all of this is that we have a situation where

18  the Court was very explicit with the committee and

19  said these are your boundaries.  Committee counsel

20  recognized that he had those boundaries.  He committed

21  to stay within them, and we have a situation where we

22  have claims that we believe just clearly go far beyond

23  those.  And the question is, how do we deal with this

24  so that we don't run into snow balling problems of

25  fees and expenses and fee applications and everything

1    else to come to the end of the road where we all end

2    up.  Where we think we could end up right now.

3              THE COURT:  Uh-huh.

4              MR. BERMAN:  It would have a huge

5    potential affect because Your Honor has seen from the

6    first interim fee applications which is where we

7    discussed this issue --

8              THE COURT:  Uh-huh.

9              MR. BERMAN:  -- that we've got pretty high

10   rates and we've got a lot of discovery out there and a

11   lot of time and effort being spent.  So the ability to

12   determine these at this earlier stage would be

13   extremely important we think for the interest of the

14   estate and the creditors.

15             THE COURT:  Well, let me ask you this,

16   Mr. Berman, really what we're talking about is any

17   additional time spent on investigating a claim to

18   then file a complaint.  If procedurally I find and I'm

19   going to give you a sneak preview that in all

20   likelihood I am so going to find that a complaint has

21   to be filed, and because Mr. Meyers made a point from

22   day one of articulating that he understands what his

23   parameters are, if I, in fact, found when a complaint

24   was filed that the complaint went outside those

25   parameters, I would take that into account in

Page 39

1    reviewing the fee application; would I not?

2              MR. BERMAN:  Presumably, yes.

3              THE COURT:  Okay.

4              MR. BERMAN:  Now the -- he's talked about

5    -- I'm not sure whether this complaint that we're

6    talking about --

7              THE COURT:  No, no.  I'm not talking about

8    Mr. Meyers complaint.  I'm talking about the

9    complaint.  The complaint against the directors and

10   officers.  I won't use any other terms.

11             MR. BERMAN:  And that really and the

12   essence of our position is that that complaint has

13   been expressed in a direct, specific and formalized

14   way.

15             THE COURT:  I understand.

16             MR. BERMAN:  It would be --

17             THE COURT:  I understand.

18             MR. BERMAN:  If doing it more specifically

19   through a different procedural device, as for example

20   it was suggested that the declaratory judgment kind of

21   complaint might be one of those ways.

22             THE COURT:  Uh-huh.

23             MR. BERMAN:  One of the things we pointed

24   out in our filing this morning is that there's been

25   ample opportunity -- this isn't a dispute obviously

1    which is just arisen.  There were ample opportunities

2    along the way including when we filed this motion

3    which now goes back a month and a half, I think.

4            THE COURT:  Uh-huh.

5            MR. BERMAN:  If --

6            THE COURT:  Well, you wanted to wait for

7    the weather to get worst; right?

8            MR. BERMAN:  Yes, but that's really what

9    the essence of our efforts is, Your Honor, because I

10   think everybody realized -- I think even Mr. Meyers in

11   his comments this afternoon, recognized that there

12   would be potentially significant benefits to the

13   committee itself for the Court to adjudicate the issue

14   because everybody knows that it's there.  Everybody

15   knows where they're going and if that case law were

16   applied at least if Your Honor agreed with the

17   District judges in the Southern District of Florida

18   and the Northern District of Georgia, then we think

19   that a very significant portion, if not all, of these

20   claims would halt now and we make some very

21   substantial progress in the administration of these

22   estates.

23           THE COURT:  Okay.  Thank you.

24           MR. BERMAN:  Thank you.

25           THE COURT:  All right.  I'm going to make

1  a ruling on the procedural issue and to the extent

2  that that provides some insight into where you all go

3  from here, it can do so.  I will tell you right now

4  that we're not going to get to the merits under this

5  motion, because this motion is not the vehicle to do

6  it, but I am going to make some observations.

7             There is no dispute that is between the

8  FDIC as receiver for the failed bank and the committee

9  for the debtor -- on behalf of the debtor holding

10 company that only the FDIC may bring derivative

11 claims, and that the debtor holding company can bring

12 direct claims.

13            As everybody agrees and the case law has

14 stated derivative versus direct is a question of state

15 law, and if you can look at Popkin versus Jacobe in

16 the In re: Sunrise Securities litigation, 916 F.2d 874

17 Third Circuit 1990, in fact, the Third Circuit so held

18 and then looked at Florida law.

19            And one of the cases  that the Court took

20 quite a look at because at the time that this case was

21 decided -- the Securities case was decided in 1990,

22 there was no Florida Supreme Court case on this issue

23 and even to date the only Florida Supreme Court case

24 that deals with this issue has absolutely nothing to

25 do with the dispute before the parties.

1                 But that case, the Sunrise Securities case

2    which was followed by Brant versus Bassett which is

3    the Southeast Banking Court Case, 827 F sub 742,

4    Southern District of Florida 1993, looked at a case

5    called Elario versus Miller, 354 South 2d 925 which is

6    the Florida Second District Court of Appeal 1978.  And

7    in that case the Court held that under Florida law "A

8    Florida Court has defined a derivative suit as an

9    action in which a stockholder seeks to enforce a right

10   of action existing in the corporation conversely a

11   direct action or as some prefer an individual action

12   is a suit by a stockholder to enforce the right of

13   action existing in him.  What these definitions

14   attempt to convey is that a stockholder may bring a

15   suit in his own right to address an injury sustained

16   directly by him and which is separate and distinct

17   from that sustained by other stockholders.  If

18   however, the injury is primarily against the

19   corporation or the stockholders generally, then the

20   cause of action is in the corporation and the

21   individual's right to bring it is derived from the

22   corporation.  If the damages are only indirectly

23   sustained by the stockholder as a result of injury to

24   the corporation, the stockholder does not have a cause

25   of action as an individual.

1              And then skipping over a few paragraphs,

2      the Court makes the observation, the corollary of

3      these principals of law is that in a derivative action

4      the corporation on behalf of which the stockholders

5      sue is an indispensable party and the Court has no

6      jurisdiction to adjudicate the rights of that

7      corporation in its absence as a party, as was the case

8      here, meaning the case before the Second DCA.

9              The corporation is a necessary defendant.

10     In other words, the corporation on behalf of which

11     plaintiff's sue must be made a party defendant so that

12     a decree may appropriately give the corporation the

13     fruit of any recovery by the plaintiffs.  The

14     corporation is not merely a proper party, but is an

15     essential indispensable party and the failure to make

16     the corporation a party is not a mere defect of

17     parties, but leaves the stockholder without a cause of

18     action and the Court without jurisdiction.

19             And in that case the issue was

20     corporations stockholder lawsuit against the other

21     stockholder and the CEO for negligence, breach of

22     fiduciary duty, mismanagement, misappropriation and

23     fraud that rendered the corporation insolvent.  There

24     was no holding company issue involved.  And that's

25     Elario versus Miller as I said at 290.926 and 927

1   citations omitted.

2           The -- in looking and trying to find other

3   Florida cases that define direct versus derivative,

4   because while I appreciate all the cases that were

5   cited by everybody, nobody cited to any Florida cases

6   that were Florida state law cases.  They cited to

7   Federal cases, some of which cited Florida Law and

8   some of which cited the law of other states, which may

9   or may not be relevant.  I did find a case of Wolf

10  versus American Savings and Loan Association of

11  Florida.  And in that case this is clearly a direct

12  action.  It was holders of preferred stock sued the

13  directors and officers for causing a merger that

14  changed their preferred stock into non-convertible

15  stock.  So that was clearly a direct cause of action.

16          But in making a ruling that the lower

17  Court had improperly held that it was a derivative

18  action and therefore, the Court -- the lawsuit should

19  not proceed, Judge Schwartz did do an inventory of

20  examples of what would constitute a direct versus

21  derivative cases, including Eisenberg versus Flying

22  Tiger Line, Inc. 451 F2d 267, Second Circuit 1971,

23  action against directors for violation of alleged duty

24  owed individually to stockholders, not to merge

25  corporation maintainable as a direct action.

1           Judge Schwartz also cited a California

2   case suit against majority shareholders for decreased

3   value of stock not derivative.  Lipton versus News

4   International, a Delaware case.  Allegations against

5   corporations and their officers and directors for

6   depravation of voting rights and waste of corporate

7   assets created individual causes of action.  A New

8   York case from 1911, complaint to set aside sale of

9   corporate stock and acts of directors states causes of

10  action for injury to stockholders individually,

11  another New York case a little bit more recent, 1955,

12  alleged wrongful recapitalization personal right

13  belonging to  stockholder, another Pennsylvania case,

14  shareholder may bring action to protect voting rights,

15  et cetera.

16           Okay.  So these are just some examples

17  it's certainly not exhaustive, but there are some

18  examples described by at least one Florida court as to

19  what would be a direct action.  So what does that mean

20  in this context?  As I eluded to before in my colloquy

21  with Mr. Berman, Judge Aronovitz in the Southeast case

22  cited General Rubber and stated that after finding

23  that a lot of the allegations of the complaint before

24  Judge Aronovitz were, in fact, derivative and

25  dismissed the complaint, noted that a suit brought by

1    a holding company against its own officers and

2    directors for damages to the holding company arising

3    from breaches of duties owed to the holding company

4    has longed been recognized as stating a direct cause

5    of action.  Citing General Rubber versus Benedict and

6    then Judge Aronovitz notes at Florida Courts have

7    followed General Rubber, but of course Judge Aronovitz

8    cites a Middle District of Florida case.

9           I don't know when I was practicing law I

10   always thought you should cite a Florida case for

11   Florida law, but that's a whole other story.  All

12   right.

13          So what that does is it recognized general

14   -- and in General Rubber, as you all know because of

15   course you memorized these cases by now, in General

16   Rubber it was the director of the plaintiff holding

17   company or parent company that was being sued for

18   allowing an officer of the subsidiary to rob the

19   company of its assets and take all the value out of

20   the company.  And that was the issue.  We didn't have

21   the fact that there were common directors in that

22   case, because the defendant was not a director of the

23   subsidiary.

24          In any event, these cases recognize that

25   the director of a corporation has a duty.  That duty

1    runs to that corporation.  That person, that human

2    being, may also be a director of the subsidiary, but

3    it doesn't negate that individual's obligations and

4    duties at the holding company level.  They don't go

5    away.  And, in deed, as General Rubber recognizes, the

6    two wrongs may be committed by the single act.  So you

7    have the person in General Rubber taking the money and

8    putting it into his competing company, that creates a

9    loss.  And then, of course, you have the failure of

10   the director at the parent company either knowing

11   about it and doing nothing about it which same act

12   creates two different wrongs.

13            I also look at Ox versus -- I think I'm

14   pronouncing that right.  Ox or Oaks versus Simon which

15   is In re: First Central Financial Corporation, 269 BR

16   502.  Which is Bankruptcy Eastern District of New York

17   2001.  And in that case 10 of the 15 directors being

18   sued by the bankruptcy trustee for a holding company

19   of an insurance company that was in bankruptcy.  The

20   issue there was the superintendent who had been

21   appointed as a receiver of the insurance company took

22   the similar position to that which the FDIC has taken

23   in this case and the issue of this identical claims.

24   And in that case what the Bankruptcy Court stated

25   there, this is Judge Craig.

1           This issue -- "This issue is clarified.
2  That is the fact that the defendants, the individuals,
3  may have dual positions of trust, one at the holding
4  company level and one at the subsidiary level."  Judge
5  Craig says, the issue is clarified when the dual
6  capacities of the defendants, one is fiduciary to
7  FCFC, which is the holding company and the other is
8  fiduciary to FCIC, which was the insurance company
9  subsidiary, are treated separately as illustrated in
10  the following example; let us consider the situation
11  where there are two corporations, parent and
12  subsidiary.  Each has one director and they are
13  different individuals.  The director at the subsidiary
14  level engages in waste and mismanagement.  The debtor
15  at the parent level knows about this and acquiesces in
16  it.  Subsequently, the parent company files for
17  bankruptcy and the trustee of parent company sues the
18  officer and director of the parent company in an
19  action for breach of fiduciary duty and failure to
20  adequately supervise the management of the subsidiary,
21  which he has a fiduciary duty to the parent company to
22  do.
23           Clearly, under General Rubber, the parent
24  company has a cause of action against it's own
25  director for breach of fiduciary duty for failure to,

1    "Take the same care of its property that men of

2    average prudence take of their own property." That's

3    quoting from General Rubber.

4            It is equally clear that the subsidiary

5    has a cause of action against its own director for

6    waste and mismanagement.  One of these causes of

7    action does not disappear merely because the director

8    of the two corporations is the same person.  And

9    that's 269 BR at 512 and 513 internal citations

10   omitted.

11           So even the FDIC recognizes its tension

12   since there are instances such as here where there are

13   competing parties to the same insurance policy

14   because they may actually be substantially similar if

15   not identical acts that caused the losses.  And it is

16   because of these potential overlapping claims that the

17   cases have consistently held, "It is the body of the

18   complaint which determines whether the injury is

19   direct as to the stockholder and the cause of action

20   individual to him or is indirect as to the stockholder

21   and the cause of action derivative from the

22   corporation.  And that's Elario, 354 So 2d at 926 and

23   In re:  Sunrise Securities Litigation 916 F2d at 882.

24   However, if you look at the Florida shareholder

25   derivative suit statute, and you look at cases that

1   are in the summary, you will see that these are not

2   the only two cases that hold this in Florida.

3              And indeed as I noted before, even in

4   Southeast Bank, Judge Aronovitz held when dismissing

5   the parties that Mr. Brant as trustee would have leave

6   to amend to add, "Any other nonderivative claims which

7   could be similarly claimed."

8              I'm not troubled by the claim letters.  I

9   believe that the committee should not have risked the

10  loss of a cause of action by being potentially over

11  inclusive and so I find that the derivative order was

12  not violated by virtue of sending those claim letters.

13  And then the bottom line is that the absence of a

14  complaint, I'm really not able to definitively rule

15  who -- what causes of action claim, but I will say

16  this, I do not disagree with Mr. Berman.

17             The complaint, at least if it's styled

18  exactly as it is set forth in the letters, if it

19  doesn't cross over the line, Mr. Meyers, of a

20  derivative claim, it skirts along the nice edge, and

21  but again, you have stated before that you are very

22  familiar with what your boundaries are and the fact

23  that the holding company may have claims by virtue of

24  allowing the subsidiary bank to enter into these

25  ridiculous lending practices may, in fact, be under

1  Florida law a direct claim of the holding company.  It

2  doesn't take away the fact that the same acts may, in

3  fact, be a violation at the bank level of obligations

4  and duties that the directors of that entity have to

5  its corporation.  And the fact that it just so happens

6  that most, if not all the directors are the same

7  people, it goes back to what Judge Craig said, which

8  is they can be exactly the same.

9        The issue is, can the committee on behalf

10  of the holding company articulate the cause of action

11  on behalf of the holding company that those acts under

12  Florida law constituted a direct injury.  And in the

13  absence of seeing the actual complaint, I do not

14  believe that the law allows me to do so.  In fact, in

15  every case and I appreciate, Mr. Berman, what you

16  said, that we don't know whether there was a specific

17  claim letter, but even if there is a specific claim

18  letter harkening back to Judge Craig who I believe

19  really articulated it best.  He said, it could be the

20  identical acts.  It's just a question whether under

21  Florida law those acts give rise to a claim at the

22  holding company level as well.  And so while I

23  appreciate the concerns of all the parties regarding

24  cost and this is a finite estate and it's also finite

25  source of recovery for both the FDIC on behalf of the

Page 52

1   bank and on behalf of the holding company to the

2   extent that it's entitled to do so, unfortunately,

3   that's the way these cases sometimes work out.

4           So, I am not going to rule on the merits

5   in the context of the motion to enforce the derivative

6   standing order, because I don't believe that the

7   committee was outside the boundaries in preparing the

8   letter.

9           Having said that, I reiterate what I said,

10  is that when it comes time to complaint time, the FDIC

11  will have the absolute right to intervene.  And while

12  I appreciate that this will cause, perhaps additional

13  cost to the estate until such time as the committee

14  completes its investigation, frankly, all the other

15  litigation I think is best served by seeing the manner

16  in which the complaint is styled because then we're

17  not talking about theories, we're talking about actual

18  fact.  I can then look at the complaint, see how the

19  causes of action are styled and be in a better

20  position to judge whether under Florida law the

21  committee has legitimately alleged a breach of

22  fiduciary duty on the holding company level as opposed

23  to on the bank level.

24          And so, I'm going to deny the motion to

25  enforce the derivative standing order because as I

1    stated, I don't believe the committee has violated

2    that order and thank you very much, Mr. Meyers, for

3    suggesting that you would file a declaratory action,

4    but please don't.  When you are ready to file your

5    complaint, file it.  And the FDIC can review the

6    complaint, will have the absolute right to intervene

7    to the extent that it's necessary and appropriate to

8    protect its interest and I'll deal with this at that

9    time.

10              MR. MEYERS:  May I address the Court?

11              THE COURT:  Yes, you may.  Although, since

12    Mr. Berman's the movant, he gets to ask me first if he

13    has anything to ask.  Do you have any questions or

14    anything you'd like to state, Mr. Berman?

15              MR. BERMAN:  No, Your Honor.

16              THE COURT:  Okay.  Then, Mr. Meyers.

17              MR. MEYERS:  Well, first of all, we

18    certainly agree with Your Honor's ruling that the

19    motion should be denied.  In terms of the issue about

20    whether the committee can file a declaratory judgment

21    action and ask the Court to rule on whether claims

22    that are -- that have been articulated in the letters

23    or that will be articulated in the declaratory

24    judgment action, whether the Court can make that

25    determination, I think I understand Your Honor to say,

1   no, that would still be advisory that under Florida

2   law you have to actually see the complaint before you

3   can determine the direct versus derivative issue.

4             THE COURT:  Uh-huh.

5             MR. MEYERS:  And I would like to just

6   address that if I could.  I'm -- it seems to me that

7   the Court -- Your Honor can certainly say that I've

8   looked at these demand letters, there's not enough

9   meat on the bones.  So if you put that in an adversary

10  and ask me for a declaratory judgment, I really don't

11  know.  You're not telling me enough for me to decide

12  whether these claims are direct versus derivative.

13            And if that's what Your Honor is saying,

14  that's one thing.  If Your Honor is saying that as a

15  procedural matter a complaint has to be filed by an

16  estate before I can determine whether they own those

17  claims or not, then that's a different matter.  And if

18  it's the latter, then I respect Your Honor's ruling,

19  and we'll proceed to that avenue.  But if it's the

20  former, then I would like to take another crack at

21  trying to put more meat on the bones.  In fact, we can

22  even file a dec action that has attached to it, in

23  theory, the form of a complaint that we would consider

24  filing.  And you might say why go through the trouble.

25  Let me just give you an example of why we might go

1    through that trouble, Your Honor.  And it is this,

2    Your Honor, I think, is presupposing that the

3    complaint that the committee would file against

4    directors and officers would be filed in this Court.

5    And, in fact, it probably would be.  But, let's just

6    say it wasn't.  Let's say we decided we were going to

7    file it --

8              THE COURT:  My feelings won't be hurt.

9              MR. MEYERS:  I understand.  But -- I

10   appreciate that.  By my point is that from -- it could

11   be that the committee decided that they wanted to file

12   these claims in State Court.  Okay.  But -- and again,

13   this is just an example.  But my point is that we very

14   much want Your Honor to determine the ownership

15   question.  And maybe you'll say, well, what

16   jurisdiction you picked to sue is where you picked for

17   ownership.  But as a debtor, and we're a committee,

18   but standing in the shoes of the debtor, we think that

19   it is the province of the Bankruptcy Court to

20   determine the ownership of assets.  And that is why we

21   -- while we disagreed with the mechanism they chose --

22             THE COURT:  They, meaning the FDIC?

23             MR. MEYERS:  They being the FDIC.  They

24   say in Paragraph 5, there's one question before Your

25   Honor, did they violate the order?  Well, we didn't

1    violate an order --

2              THE COURT:  Okay.  And I found you didn't

3    violate the order.

4              MR. MEYERS:  Right, but we agree with the

5    FDIC that Your Honor should be the one that determines

6    whether or not the estate owns these claims.  And so,

7    if Your Honor is saying, I've looked at these demand

8    letters, you can put -- you put those claims in a

9    complaint, I can't tell.  Then I understand that, and

10   we could then decide whether we want to proceed to put

11   more meat on the bones.  And I think we probably would

12   because I think we very much would like Your Honor to

13   rule on that issue.

14             THE COURT:  Well, I guess you could do --

15   I guess you could do it one of two ways; you can draft

16   your complaint, if you believe you are ready to draft

17   your complaint, and attach it to a motion and say,

18   Judge, tell us before we file this and give the FDIC

19   the opportunity to respond.  But I have to see the

20   complaint.  Now, of course, what happens if I say no,

21   you don't own this one, you don't own this one, you

22   don't own this one.  Then are you going to file

23   amended and then I got to look at that amended

24   complaint, which I'm -- I can do.  But I'm saying is

25   that -- what Florida -- what the case law says and

1    what I'm saying is, I can't tell from that letter.  If

2    I looked at the letter strictly on its face, yes,

3    right now it appears that those would be derivative

4    claims, but having said that, in reading the case law

5    and reading over the state law, it is very clear to me

6    that the law recognizes that the holding company has

7    its -- the directors and officers of a Florida

8    corporation have two duties to their shareholders.

9    They have the fiduciary obligations, and if they're

10   breached, they're breached.  Okay?  And then they have

11   the duty to exercise business judgment.

12            Okay.  Now, there's case law that says

13   that those are pretty much the same thing, that the

14   fiduciary duty is measured by whether the business

15   judgment was exercised properly.  But the bottom line

16   is that in the absence of seeing how you articulate in

17   a complaint how that fiduciary duty was breached or

18   how the business judgment rule was violated, I have no

19   way of saying, yes, Paragraphs 12 and 13, definitely

20   derivative.  If you want me to say that today, I'll

21   say it today.  Yeah, today they look pretty much

22   derivative.  But having said that, what I'm

23   recognizing having reviewed the case law is perhaps

24   they're not.

25            Okay.  Now, so how procedurally you choose

1    to do it, I am going to have to see the actual

2    complaint that you intend to file or have filed.  If

3    you choose to go forward in State Court, you are a

4    lucky man.  Because since the time that I used to go

5    into State Court holding my books to my chest in fear,

6    we have an excellent State Court bench.  An excellent

7    State Court bench.  And virtually, any judge you got,

8    would be a great judge.

9            But if you want me to decide the ownership

10   issue, then you have to do one of two things:  Get

11   that declaratory judgment after your final complaint

12   is ready to go or file the complaint, and then seek to

13   abate it while I rule.  Now, I don't know what the

14   service of process rules are under State law, and that

15   might create problems for you.  However you proceed, I

16   know Mr. Berman and Mr. Kline are anxious to have an

17   answer.  And I know at some point you are answer to

18   have an answer, but you're not going to get the answer

19   from me until I see the actual complaint that you

20   either have filed or you intend to file.  Once you do

21   that, I am more than happy to provide the answer.

22   Although I am sure that any of my colleagues in the

23   State Court, to the extent they have jurisdiction to

24   so rule, will be happy to do so.

25            MR. MEYERS:  Okay.  Thank you, Your Honor

1   and you've answered my question, which is that it's

2   not a -- it's not -- a complaint doesn't have to

3   actually be filed as a -- you're not ruling that it

4   has to filed as a procedural matter before it can be

5   addressed, but you're ruling that you have to see --

6   you have to see what it's going to look like, not just

7   what it looks like in these demand letters before you

8   could undertake an analysis.

9           THE COURT:  Well, because a demand letter

10  isn't your complaint.

11          MR. MEYERS:  And don't disagree, and we

12  did not intend to in our declaratory judgment action

13  to just append the demand letters and say, have at it.

14  In any event that was -- but I understand and we now

15  understand what our options are in terms of going

16  forward.

17          THE COURT:  Okay.

18          MR. MEYERS:  Thank you.

19          THE COURT:  All right.  Mr. Berman.

20          MR. BERMAN:  If I may just very quickly,

21  I'm not sure I understand how that approach can be

22  consistent with what your ruling is, and I'm concerned

23  about it because I don't want to have another set of

24  proceedings and come out again waiting for an ultimate

25  complaint to be filed.  I mean, the suggestion that a

1   declaratory judgment action attaching a -- what would

2   be a complaint, you might come out the same way

3   Aronovitz did and say, I don't think that this

4   complaint, you know, in its present form is going to

5   be sustainable.

6              THE COURT:  Uh-huh.

7              MR. BERMAN:  You would have to amend it.

8   In effect, you'd have to do another one.  That -- they

9   would still be free, presumably, to ultimately go and

10  do that.  So, that would be as advisory it seems to me

11  under the logic of Your Honor's ruling today as this

12  particular motion is now.

13             THE COURT:  Uh-huh.

14             MR. BERMAN:  And I'm only concerned and I

15  only stand to address this because I'm fearful that

16  we're going to see now a declaratory judgment --

17             THE COURT:  Uh-huh.

18             MR. BERMAN:  -- action with a proposed

19  complaint, which wouldn't bind them unless they were

20  to agree in seeking declaratory relief that that is

21  it, and that there would be nothing else.  If that

22  were so, then I think we'd have the equivalent of an

23  actual complaint, but short of that, I don't see how

24  we're not in the same conundrum we're in today.  And

25  as far as the Court's concerned, I'm sure that there

1   are some attractive parts about filing it in State

2   Court, but it would be immediately removable by us,

3   and I suspect that that would be --

4              THE COURT:  I'm sure it would be, but

5   hopefully it would go to Judge Huck.  Now, I'm just

6   kidding.  Here's the thing, let's pretend that the

7   complaint is filed.  And then whatever judge, whether

8   it's me or it's whatever District Court judge gets the

9   removed action, makes a ruling that portions of the

10  complaint should be dismissed for lack of standing.

11  Then in all likelihood, because it's the first go

12  round it is, at least possible, if not probable that

13  at least round one, the judge is going to allow the

14  committee to amend.  Now, at that point there are

15  going to be actual defendants involved, invoking

16  things such as Rule 15, if it's in District Court and

17  whatever the State Court rule is which I pushed out of

18  my mind as soon as I became a Bankruptcy Judge, but

19  wouldn't that be a potential result as well?

20             MR. BERMAN:  Of course.

21             THE COURT:  Okay.  Well, I am confident

22  that you gentlemen can figure out the vehicle, but I'm

23  telling you now I have to see an actual complaint.

24  Okay?  So whether it's filed or not filed, I'm also

25  going to acknowledging, Mr. Berman, your point, yes,

1    it could be that if I rule against the committee, I'll

2    say, one more shot and then you have to go for it.

3            Of course, I'll -- I don't know what the

4    defendant's would do once the complaint was filed it

5    gets into all sorts of procedural fun, but I'll let

6    you all work out what you want to do procedurally,

7    but I need to see the actual complaint filed or not.

8    And if you all agree that it can be, the complaint

9    that will be filed attached to a dec action, that's

10   fine.  If you'd rather file the complaint and take

11   your chances regarding whatever the service of process

12   rules, that's fine.  I think Mr. Meyers that

13   Mr. Berman is correct.  I think it's highly unlikely

14   that the FDIC isn't going to seek to intervene and

15   remove right away.  So you all can choose your forum,

16   but that's not an issue before me today, and I'm not

17   even going to worry about it because it's not my issue

18   right mow.  So, go ahead.  In the microphone so the

19   gentleman on the phone can hear you.

20           MR. MEYERS:  But just so I'm clear, you --

21   assuming we don't agree, we still do have the option

22   of attaching a complaint to a dec action; correct?

23           THE COURT: I'm going to reiterate what I

24   said.  I need to see the actual complaint that you

25   have either filed or you intend to file.

Page 63

```
 1              MR. MEYERS:  That's fine.

 2              THE COURT:  Okay.

 3              MR. MEYERS:  But we don't have to agree

 4   with the FDIC as they said that it would be the only

 5   complaint we ever file.

 6              THE COURT:  I've already said that it's

 7   not unlikely that if you file a proposed complaint, I

 8   would give you one more shot at the apple if I felt

 9   there was any conceivable way in which you could

10   articulate the cause of action.  And as I said, you

11   have the extra added incentive because you know what

12   your parameters are, that I get to review your fee

13   application, so I know you'll be even more circumspect

14   than you would otherwise be.

15              MR. MEYERS:  I'm confident you'll find

16   everything we do to be acceptable, Your Honor.

17              THE COURT:  I'm sure I will, maybe not

18   what Mr. Samole does, but, perhaps.

19              MR. MEYERS:  Him too.

20              THE COURT:  Okay.  So any other questions?

21              MR. MEYERS:  No other questions.  Thank

22   you.

23              THE COURT:   Any other questions from

24   anybody else?  No.  Okay.  All right.  Well, then you

25   all have a very Happy New Year and a safe travels back
```

1    to where cold reaches home is, and I'll see you all --

2    I'm sure I'll see you all soon, right?

3                    MR. BLOOM:   January 11th, Your Honor.

4                    THE COURT:   Happy New Year.

5             (Thereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 65

1                           CERTIFICATION

2

3    STATE OF FLORIDA )

4                         )

5    COUNTY OF MIAMI-DADE)

6

7           I, Carmen E. De La Cruz, shorthand Reporter

8    and Notary Public in and for the State of Florida at

9    Large, do hereby certify that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17           WITNESS my hand this 15th day of January,

18   2010.

19

20

21           _____

22           Carmen E. De La Cruz

23           Court Reporter and Notary Public

24           DD545111 Expiration Date 08/2011

25